IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOANN ENRIQUE, | § | |
| | § | No. 618, 2015 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. K12C-10-028 |
| STATE FARM MUTUAL | § | |
| AUTOMOBILE INSURANCE CO., | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: May 4, 2016
Decided: June 14, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, and **SEITZ**, Justices; and **DANBERG**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

William D. Fletcher, Jr., Esquire *(argued)*, Schmittinger & Rodriguez, P.A., Dover, Delaware, for Plaintiff Below, Appellant Joann Enrique.

Jeffrey A. Young, Esquire *(argued)*, Young & McNelis, Dover, Delaware, for Defendant Below, Appellee State Farm Mutual Automobile Insurance Company.

**SEITZ**, Justice, for the Majority:

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

# I.  INTRODUCTION

Joann Enrique appeals from the Superior Court's grant of summary judgment for State Farm Mutual Automobile Insurance Company in an action brought by Enrique for bad faith denial of uninsured motorist ("UM") coverage stemming from a 2005 car accident.  According to Enrique, the Superior Court erred because disputed issues of material fact existed whether State Farm should be liable for bad faith while handling Enrique's UM insurance claim.  After a careful review of the record on appeal, we agree with the Superior Court that the record does not support a bad faith claim against State Farm.  Accordingly, we affirm the Superior Court's decision.

## II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 2005, an uninsured driver crashed into Enrique's car by improperly turning into her lane.  Enrique suffered a fractured rib, trauma to the right knee requiring arthroscopic surgery, trauma to the left knee for which she was a candidate for arthroscopic surgery, abrasions, and soft tissue injuries.  Enrique, who was a cafeteria worker, was out of work for about nine months after the accident.  Although she returned to work in a limited capacity in February, 2006, she was only capable of light duty until June 2006.

Enrique retained an attorney to assist with her insurance claim.  She exhausted her personal injury protection benefits, and then sought to recover additional money for her injuries and losses through the State Farm UM policy covering her car.  The UM policy limits were $100,000.  State Farm initially assigned Enrique's insurance claim to a Delaware adjuster.  Due to a high volume of Delaware claims at the time, in August 2006, State Farm reassigned the claim to J.R. Roach, an adjuster in West Virginia.

2

Roach consulted a number of State Farm employees for advice on handling the claim: John Rogin, a Delaware State Farm representative, Paul Gerlitz, the Delaware State Farm team manager, and Roach's supervisor, Mary Adkins. After the initial review, in August 2006, Adkins authorized Roach to settle the claim in a range between $17,500 and $22,500. In September 2006, State Farm offered Enrique $17,500 to settle her claim, which she rejected. At the time, Roach valued the claim between $25,000 and $30,000. Roach had some reservations about this range due to incomplete information about the nature and extent of Enrique's injuries. The Delaware team manager, Gerlitz, also expressed concerns about preexisting knee problems, and valued her claim in the range of $19,000 and $25,000. State Farm then made another settlement offer, this time for $19,000. In March 2007, Enrique rejected the $19,000 offer.

Throughout the settlement negotiations and the processing of Enrique's claim, State Farm personnel expressed concerns about whether Enrique's knee injuries were caused by pre-existing conditions. These concerns were based on Enrique's medical records obtained by State Farm sometime before January 2008. In January 2008, Joan Barker, a State Farm injury claim trainer, questioned whether Enrique's knee injuries were pre-existing, based on photographs, MRIs, and other records, and made note of the outstanding causation issues.[1] Roach also took another look at Enrique's medical history and condition, and made note of her chondromalacia patellae (a degenerative knee

---

[1] App. to Opening Br. at 194 ("I reviewed the photos of the knees. . . . There was [an] MRI followed by surgery on the right knee. The operative report showed no tears in the medial meniscus and no tears of the lateral meniscus.").

condition), Lyme disease, knock–knees, hypothyroidism, smoking, obesity, and other issues. Roach also remarked that it was not clear to what extent the accident had caused Enrique's knee problems, but noted that the claim could be valued between $35,080 and $50,080 after the causation issue was clarified.

The record is unclear about the reasons for the large lapses in time during the settlement negotiations. In any event, in January, 2008, Enrique made her first demand for $165,000. In March 2008, Roach contacted Dover attorney Brian McNelis, and sought his opinion on the value of Enrique's claim. McNelis believed the claim could be worth up to $50,080 if the accident caused Enrique's knee injuries. State Farm then offered Enrique $25,000 to settle her claim. She rejected the offer and instead continued to demand $165,000—$65,000 more than the policy limits.

After Enrique's demand, in May 2008, the parties agreed to hire a doctor for an independent medical examination ("IME") to examine Enrique and to evaluate her medical condition. Dr. Lawrence Piccioni issued a report on July 23, 2008, and concluded that "[t]he chondromalacic changes would definitely pre-exist the injury of September 26, 2005 and likewise, most likely the meniscus tear would predate the September 26, 2005 injury."[2] But Dr. Piccioni also believed that the accident had aggravated Enrique's degenerative knee condition. Dr. Piccioni based his conclusions on an examination of Enrique, "records from Dr. Eric Schwartz, Dr. Glenn Rowe, Dynamic Physical Therapy, Kent General Hospital, vehicle pictures from the accident, and [the]

---

[2] *Id.* at 264.

State of Delaware Uniform Traffic Collision report."[3]  Dr. Piccioni could not determine the extent to which Enrique's condition could be attributed to the accident, however, because certain records pre-dating the accident appeared to be missing.

While the parties were waiting for the IME report, in July 2008, Enrique filed suit against State Farm.  She sought UM benefits up to the $100,000 policy limits, as well as punitive damages against State Farm for bad faith by refusing to pay up to those limits.  In support of the bad faith claim, Enrique alleged that State Farm refused to compensate her up to the UM policy limits without any reasonable justification.  In October 2008, the Superior Court severed and stayed the bad faith claim pending resolution of the UM damages claim.  The parties then stipulated to a partial dismissal of the bad faith claim without prejudice.

State Farm retained Delaware attorney Colin Shalk to defend the UM lawsuit.  In August 2008, Shalk evaluated the case, including the IME report, and valued Enrique's claim between $35,000 and $50,000.[4]  At about the same time, after seeing the IME report, Roach increased his value from his earlier range of $35,000 to $50,000 to between $62,080 and $94,960.  Roach seems to have erroneously concluded from the IME report that Enrique's injuries were indisputably caused by the accident.[5]  In August 2008, Betsy

---

[3] *Id.* at 262.

[4] The State Farm logs show that Shalk initially valued the claim between $35,000 and $50,000, but in a formal letter to Roach in February 2009, Shalk assigned a value between $45,000 and $50,000 to the claim. *See id.* at 208, 268.

[5] App. to Opening Br. at 205 ("The described [injuries] were caused by the [motor vehicle accident]."); *id.* at 209–10 ("I disagree [with the] range of $62,080 to $94,960. . . . [Dr. Piccioni]

Hanson, a State Farm claim manager, expressed her disagreement with Roach's estimate of $62,080 to $94,960 because of the outstanding causation issues. Hanson was especially concerned because she knew that Enrique had swelling of the legs and physical therapy before the accident, and believed these facts could be further evidence that the knee injuries were not caused entirely by the accident.[6] Roach, Shalk, and Hanson all had access to the same IME report and records, were all experienced in valuing insurance claims, and arrived at different values.[7] Due to the continuing impasse, in September 2008 State Farm decided to advance Enrique $25,000, as the parties both agreed the claim was worth at least that much.

As trial approached, State Farm offered Enrique another $20,000 to settle the case, for a total of $45,000. Enrique also revised her demand, and as of January 2010, was willing to settle for an additional $65,000, representing a $90,000 demand.[8] The parties could not bridge the gap, and the damages case went to trial in February 2010. The jury returned a $260,000 verdict. State Farm did not seek remittitur, but did appeal on an evidentiary issue. This Court affirmed.[9] State Farm paid the remaining $75,000 of their policy limits, costs, and interest.

---

specifies in his report that he did not have prior records or x-ray/MRI films to review, and opines the chondromalacic changes pre-exist [the accident].").

[6] *Id.*

[7] Roach also came up with at least two additional and different valuations after August 2008. *See id.* at 130–31 ($25,000 to $35,000); *id.* at 128 ($45,000 to $50,000).

[8] App. to Answering Br. at 17 ("[Enrique's demand is] $65,000 new money to settle the UM claim. $65,000 + $25,000 paid[.]").

[9] *State Farm Mut. Auto. Ins. Co. v. Enrique*, 3 A.3d 1099 (Del. 2010) (Table).

6

Enrique then pursued her bad faith claim against State Farm, claiming as damages the unpaid $160,000 portion of the jury verdict, prejudgment interest, and punitive damages.[10] Enrique retained as an expert witness, Ivan Cohen, an insurance broker in Carmel, New York. Cohen provides insurance advice and sells policies. Cohen believed that, under his view of Delaware law, State Farm handled Enrique's claim in bad faith. After discovery, State Farm moved for summary judgment. On October 14, 2015, the Superior Court granted State Farm summary judgment because Enrique failed to make a *prima facie* showing of bad faith.[11] The court based its decision on causation issues arising from Enrique's pre-existing knee problems (which gave State Farm a reasonable basis for its actions), State Farm's multiple valuations of Enrique's claim that put it below policy limits, and her failure to offer facts showing State Farm exhibited reckless indifference in handling her claim.[12] Enrique now appeals from that judgment.

### III.   STANDARD OF REVIEW

This Court reviews the Superior Court's summary judgment decision *de novo*.[13] "A grant of summary judgment cannot be sustained unless there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[14] "The facts of record, including any reasonable hypotheses or inferences to be drawn therefrom, must be

---

[10] Because the bad faith claim was dismissed without prejudice in January 2009 under the terms of the parties' stipulation, Enrique filed a new action on October 18, 2012.

[11] *Enrique v. State Farm Mut. Auto-Mobile Ins. Co.*, 2015 WL 6330920, at *3–5 (Del. Super. Oct. 14, 2015).

[12] *Id.* at *4.

[13] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011).

[14] *Lank v. Moyed*, 909 A.2d 106, 108 (Del. 2006).

viewed in the light most favorable to the non-moving party."[15]  But "[t]his Court will not, draw unreasonable inferences in favor of the non-moving party."[16]

## IV.  ANALYSIS

An insurance policy is a contract between the insurer and the insured.[17]  In all contracts, there is an implied covenant of good faith and fair dealing.[18]  The covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[19]  We have recognized that an insured has a cause of action for breach of the implied covenant of good faith when the insurer refuses to honor its obligations under the policy and clearly lacks reasonable justification for doing so.[20]  A mere delay in paying benefits is insufficient to constitute bad faith, but "[d]elays attributed to a 'get tough' policy, *i.e.*, a general business practice of claims denial without a reasonable basis, may subject the insurer to a bad faith claim."[21]

---

[15] *Williams v. Geier*, 671 A.2d 1368, 1375 (Del. 1996).

[16] *Smith v. Del. State Univ.*, 47 A.3d 472, 477 (Del. 2012).

[17] *See Connelly v. State Farm Mut. Auto. Ins. Co.*, __ A.3d __, 2016 WL 836983, at *3 (Del. Mar. 4, 2016); 16 WILLISTON ON CONTRACTS § 49:1 (4th ed.) ("An insurance policy is a contract or agreement that is essentially like all other contracts, albeit with special features.").

[18] *Connelly*, 2016 WL 836983, at *3 ("A duty of good faith and fair dealing is implied in every contract.  In the context of an insurance policy, the implied covenant has historically included a duty to 'settle [claims] within policy limits where recovery in excess of those limits is substantially likely.'" (quoting STEVEN PLITT ET AL., COUCH ON INSURANCE § 203:13 (3d ed. 2008))).

[19] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) (quoting *Nemec v. Shrader*, 2009 WL 1204346, at *5 (Del. Ch. Apr. 30, 2009)).

[20] *See Connelly*, 2016 WL 836983, at *3; *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445–46 (Del. 1996); *Pierce v. Int'l Ins. Co. of Ill.*, 671 A.2d 1361, 1367 (Del. 1996); *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 265–66 (Del. 1995).

[21] *Tackett*, 653 A.2d at 266.

Courts have disagreed about whether the bad faith cause of action sounds in contract or tort, or both.[22]  This Court has grounded the claim in contract, because "there is no sound theoretical difference between a first-party insurance contract and any other contract."[23]  Although direct and consequential damages would ordinarily be the limit of damages for a breach of the implied contractual obligation of good faith, earlier cases of this Court carved out an exception for insurance contracts.[24]  As the law now stands, given the special nature of the insurance relationship, punitive damages are available as a remedy for bad faith breach of the implied covenant of good faith where the plaintiff can show malice or reckless indifference by the insurer.[25]

---

[22] *See Pickett v. Lloyd's*, 621 A.2d 445, 454 (N.J. 1993) ("Because we view the cause of action as sounding more in contract than in tort, we believe that the familiar principles of contract law will suffice to measure the damages."); *Gruenberg v. Aetna Ins. Co.*, 573, 510 P.2d 1032, 1036 (Cal. 1973) ("[The implied covenant of good faith and fair dealing,] the breach of which sounds in both contract and tort, is imposed because there is an implied covenant of good faith and fair dealing in every contract (including insurance policies) that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." (internal quotations omitted)); COUCH, *supra* note 18, § 204:14 ("[M]any jurisdictions now do recognize some form of tort liability for bad faith, or at least expanded damages for bad-faith breaches of the insurance contract . . . ."); STEPHEN S. ASHLEY, BAD FAITH ACTIONS: LIABILITY & DAMAGES § 1:2 (2d ed. 1997) (describing the bad faith cause of action as a "hybrid" that combines "features of both tort and contract claims"); Turner W. Branch & Garth H. Allen, 45 AM. JUR. TRIALS 475 (Originally published in 1992) ("Some states refer to the cause of action as a 'hybrid' of tort and contract law.").

[23] *Tackett*, 653 A.2d at 264 (internal quotations and citations omitted).

[24] This Court's cases dealing with bad faith insurance claims have expressly authorized punitive damages against insurers.  *E.g.*, *id.* at 266 ("[I]f the denial or delay is wilful or malicious, it may provide the basis for punitive damages.").  We note the doctrinal tension between basing a cause of action in contract and permitting punitive damages, but see no occasion in this case to re-visit the issue.  *Compare* RESTATEMENT (SECOND) OF CONTRACTS § 355 (1981) ("Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."), *with Pressman*, 679 A.2d at 446 ("This Court has permitted punitive damages in the insurance 'bad faith' context.").

[25] *See Pressman*, 679 A.2d at 446–47 ("Insurance is different."); *Connelly*, 2016 WL 836983, at *3 ("The basis of the insurer's duty to settle within policy limits is the insurer's exclusive control

9

Like the Superior Court, we have found no support in the summary judgment record for a bad faith claim against State Farm. At the time Enrique filed her bad faith claim in July 2008, various State Farm employees with claims-handling experience valued her claim between $19,000 to $30,000. State Farm obtained medical records raising causation issues because of Enrique's pre-existing degenerative knee condition, Lyme disease, knock–knees, the fact that she had had physical therapy just before the accident, and other issues. After State Farm offered Enrique $19,000 to settle her claim, Enrique responded with an unreasonable $165,000 demand well above policy limits. In response, State Farm sought the advice of a Dover, Delaware personal injury defense attorney, who valued Enrique's claim as high as $50,080 if causation could be proven. State Farm then offered Enrique $25,000 to settle her claim. She rejected the offer and continued to demand $165,000. The parties attempted to resolve their impasse through an IME. Without waiting for the IME results, Enrique filed suit under the UM policy and for bad faith.[26]

That is the sum and substance of the record before Enrique filed her bad faith claim in July 2008. Nothing in the pre-suit record supports a bad faith claim.

over settlement negotiations and defense of litigation, which results in a conflict of interest between the insurer and the insured." (citation omitted)); *see also Pierce*, 671 A.2d at 1367 ("[W]hen the bad faith actions of an insurer are taken with a reckless indifference or malice toward the plight of the [insured], punitive damages are justified."); *Tackett*, 653 A.2d at 265 ("[A]n insured may be entitled to the recovery of punitive damages in a bad faith action if the insurer's breach is particularly egregious."). We have characterized malice as situations where the insurer acts with an "evil motive," and recklessness indifference as instances where "the [insurer must] foresee that [its] unacceptable conduct threatens particular harm to the [insured]," and yet proceeds anyway. *Jardel Co. v. Hughes*, 523 A.2d 518, 529–30 (Del. 1987).

[26] Enrique filed her first complaint on July 22, 2008 and Dr. Piccioni issued his IME report on July 23, 2008.

10

Admittedly, Enrique was not limited to the pre-2008 record to support a bad faith claim.[27]  But the post-2008 record also fails to show bad faith conduct by State Farm in handling Enrique's claim.  As noted before, Delaware attorney Colin Shalk, hired to defend the case, had the benefit of the IME report and other information in the file, and valued Enrique's claim between $45,000 and $50,000.[28]  Shalk's valuation took into account Dr. Piccioni's uncertainty about causation,[29] but overall treated causation as more or less established.[30]  Around the same time Roach, after seeing the IME report, increased the value from his earlier range of $35,000 to $50,000 to between $62,080 and $94,960.  But other State Farm adjusters questioned Roach's revised valuation because the causation issues noted in the IME report had not been resolved.  State Farm then advanced Enrique $25,000 and offered an additional $20,000 to settle the case.  Enrique countered with a last offer below policy limits.  The jury's verdict eclipsed all the offers

---

[27] *Tackett*, 653 A.2d at 266 (considering post-suit conduct by State Farm to support bad faith claim); *White v. W. Title Ins. Co.*, 710 P.2d 309, 319 (Cal. 1985) (considering conduct during litigation in support of bad faith claim); *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 907 (Pa. Super. 1999) ("[T]he conduct of an insurer during the pendency of litigation may be considered as evidence of bad faith . . . .").

[28] The State Farm logs show that Shalk initially valued the claim between $35,000 and $50,000, but in a formal letter to Roach in February 2009, Shalk assigned a value between $45,000 and $50,000 to the claim. App. to Opening Br. at 208; *id.* at 268.

[29] App. to Opening Br. at 268–69 ("[Dr. Piccioni] thinks that the right knee problems were caused by the accident [and that] she has 'some' permanent impairment to the right knee related to the accident.  Insofar as the left knee is concerned he said the surgery is medically and necessarily related to the accident 'at this point.'  However he said that at some point should she not elect to have the surgery then the relationship between the accident and the as yet unscheduled surgery would probably no longer be related.").

[30] *Id.* at 269 ("I've simply assumed in evaluating this case that the plaintiff has had one accident related surgery; a rib fracture; residual problems with the left leg which both doctors seem to think are related to the accident; and which would merit surgery if she decided to have it now.").

and counteroffers of the parties. None of these facts support a finding of bad faith conduct by State Farm in processing Enrique's claim.

Enrique would have us invoke a hindsight presumption that the failure to offer policy limits or seek remittitur after a verdict in excess of those limits constitutes bad faith. No such presumption exists. Further, such a presumption would ignore the reality of valuing personal injury claims: putting a dollar value on general damages and pain and suffering is inherently subjective.[31] The range of values of the various people who reviewed Enrique's claim makes the point. State Farm offered to settle for $45,000, Enrique's final demand was $90,000, and the jury found $260,000 in damages. Without more, rational differences in claim valuations do not lead to an inference of bad faith. Here, the record shows that State Farm and Enrique had different views of the value of the claim; State Farm sought advice from two attorneys, attempted to reach a settlement with Enrique, and failed. State Farm had bases for its claim valuations, and there is no

---

[31] *See Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 226 (3d Cir. 2000) ("[A] personal injury claim is unique and generally not divisible or susceptible to relatively precise evaluation or calculation. The 'pain and suffering'/general damage elements of a personal injury claim . . . are inherently flexible and subject to different and potentially changing evaluations." (quoting *Voland v. Farmers Ins. Co. of Ariz.*, 943 P.2d 808, 812 (Ariz. Ct. App. 1997)); *Rowe v. Nationwide Ins. Co.*, 6 F. Supp. 3d 621, 629 (W.D. Pa. 2014) ("Plaintiffs' disagreement with Defendants over the value of their claims is simply not a basis for a contractual bad faith claim where Plaintiffs have not shown that Defendants breached some contractual duty."); *Evangelista v. Nationwide Ins. Co.*, 726 F. Supp. 1057, 1060 (S.D. Miss. 1988) ("A personal injury claim includes various intangibles such as pain and suffering which render it much harder to evaluate than a static property damage claim. However, that does not render the insurer guilty of a bad faith denial of a claim simply because an insured believes her claim is worth more than the insurer offers.").

12

evidence that creates an inference that those reasons were pretextual. State Farm thus was not "clearly without any reasonable justification" for its valuations.[32]

Enrique focuses on several events during State Farm's claims-handling process in an attempt to demonstrate bad faith. According to Enrique, State Farm failed to obtain medical information it acknowledged it needed to evaluate the claim, rejected Roach's highest valuation without justification, ignored the IME report, and unjustifiably proceeded as if the knee injury was pre-existing. None of these reasons, individually or collectively, is indicative of bad faith.

In August 2008, Hanson noted that it might be wise to consider an addendum to the IME report. State Farm already had many of Enrique's medical records, some of which showed pre-existing conditions, but its medical records were incomplete.[33] State Farm sought additional medical records from Enrique for an addendum to the IME report addressing the causation issues.[34] For whatever reason, despite promising to do so, Enrique's attorney never sent them to State Farm.[35] Far from being the result of State

---

[32] *Tackett*, 653 A.2d at 264 (citation omitted).

[33] App. to Opening Br. at 208 ("[W]e do not have a complete prior records set . . . .").

[34] *See, e.g.*, App. to Answering Br. at 19 ("I still have questions about this claim since we do not have a complete prior records set (it appears [Enrique] was engaged in [physical therapy] a few months prior to this loss) and I have questions about exactly what [Dr. Piccioni] is concluding.") (Aug. 25, 2008); App. to Opening Br. at 209 ("When we have the necessary [information] (complete prior records including [physical therapy]), we can consider an addendum to IME to address causation/extent of aggravation of chondromalacia and re-evaluate.") (Aug. 26, 2008); App. to Answering Br. at 20 ("This will be further [evaluated] when we have a complete copy of the prior records.") (Mar. 2, 2009).

[35] App. to Answering Br. at 6 ("Called [Enrique's attorney] to [request] copies of her prior records . . . .") (Jan. 31, 2008); *id.* at 12 ("[Enrique's attorney] said he'll send the priors to me after he gets them . . . .") (Feb. 4, 2008); App to Opening Br. at 221 ("We have not [received]

13

Farm's bad faith conduct, the information void resulted from Enrique's failure to follow through.

Enrique also points to Roach's later $62,080 to $94,960 valuation, and claims that State Farm acted in bad faith by "ignoring" it. But isolating one of Roach's many valuations fails to raise a disputed issue of material fact about State Farm's good faith for several reasons apparent from the record. Roach first valued Enrique's claim at between $25,000 and $50,000, and then revised his estimate to a range of $62,080 to $94,960. At other times, he assigned values of $25,000 to $35,000, and $45,000 to $50,000. Roach was also one of many attempting to value Enrique's claim. Shalk, an attorney experienced in defending insurance claim litigation, estimated the claim was worth between $35,000 and $50,000. Hanson believed that $62,080 to $94,960 was too high, based on the records she examined. Except for Roach at one moment in time, all of the evaluators were under $50,000. Even Enrique offered to settle under policy limits. These disparate valuations, each assigned to the same claim by qualified and experienced individuals, demonstrate the inherently subjective nature of valuing Enrique's claim. What Enrique has not pointed us to in the record is evidence of bad faith.

Enrique also relies on the IME report, and claims that State Farm ignored Dr. Piccioni's conclusions. But the IME report did not assign a dollar amount to her injuries. The report is a doctor's evaluation of Enrique's medical condition. Equally important, the IME report made no clear conclusions about the causation issue. Rather, it left room

any new medical [information. Shalk] believes our [valuation] is appropriate. [Shalk] will call me if he receives new medical [information] from [Enrique's attorney].") (Apr. 24, 2009).

for good faith disagreement. Dr. Piccioni believed that Enrique's knee problems were aggravated by the accident,[36] but also that the underlying problems that led to the injuries were pre-existing.[37] Enrique's assertion that there was "no basis" to conclude that Enrique's knee injuries were pre-existing is refuted by the plain language of the IME report.

Enrique also contends that the Superior Court erred by not giving more weight to the conclusions in Cohen's expert report. Cohen, who is an insurance broker in Carmel, New York, who never adjusted claims, and who is not a lawyer, believed that State Farm acted in bad faith under Delaware law. In Cohen's report and his deposition, he essentially expressed opinions on the law, not the facts.[38] His expert report reads like a

---

[36] App. to Opening Br. at 264 ("[T]he patient, while having degenerative changes in the knees on MRI's which predated this accident, shows no records of symptomatic treatment prior to the accident[,] and again, they are typical injuries seen when the knees hit the dashboard."); *id.* at 265 ("[I]f the patient had elected for surgery of the left knee, since she had been treated for left knee problems and it is still symptomatic, I would say that it is related to the accident . . . .").

[37] *Id.* at 262–63 (degenerative changes in both knees); *id.* at 264 ("[T]he chondromalacic changes would definitely pre-exist the injury of September 26, 2005 and likewise, most likely the meniscus tear would predate the September 26, 2005 injury. Again, it is not 100 percent certain that there is a meniscus tear."); *id.* at 265 ("Certainly the chondromalacic changes are pre-existing, and it can be construed that the medial meniscus degenerative changes are pre-existing, prior to the injury.").

[38] *E.g.*, *id.* at 150–51:

> State Farm Mutual Insurance Company . . . acted under a bad faith breach of Enrique's insurance claim. "A bad faith breach of insurance claim requires the insurer to have failed in bad faith to investigate or process the claim or to have delayed in its payment obligation. Bad faith requires the insured to show that the insurer's denial of benefits was "clearly [sic] without any reasonable justification." *Coleman Dupont Homsey v. Vigilant Ins. Co.*, 496 F. Supp.2d 433, 437 (D. Del. 2007). Using any test of reasonableness, State Farm denied paying the initial claim, refused two settlement offerings from Enrique, went to trial and lost a jury verdict that was more than two and one half times the policy limit, appealed the verdict and lost the appeal, and continues, as of this writing, to refuse to make proper restitution to Enrique, all in the absence of existing facts or

15

legal brief.  He was unqualified to express opinions on Delaware law.[39]  The Superior Court correctly accorded the report little weight on summary judgment.

## V.    CONCLUSION

Through this decision, we do not hold that an insured pursing a bad faith claim against an insurer must come forward with a smoking gun to survive summary judgment.  In an appropriate case, inferences from facts can lead to a triable bad faith claim.  But here, Enrique prematurely filed suit claiming bad faith on what could charitably be described as the thinnest of allegations.  Enrique has also not pointed us to post-suit evidence of misconduct by State Farm in handling Enrique's claim.  Without some evidence of bad faith, the Superior Court properly granted summary judgment to State Farm.  The judgment of the Superior Court is affirmed.

---

any bona fide dispute.  State Farm used their economic clout to take advantage of an [sic] Enrique by not providing what they had contractually promised.  Such action clearly indicates that State Farm was affirmatively operating with furtive design or ill will.

[39] *See Itek Corp. v. Chicago Aerial Indus., Inc.*, 274 A.2d 141, 143 (Del. 1971) ("Testimony from an expert is inadmissible if it expresses the expert's opinion concerning applicable domestic law."); *United Rentals, Inc. v. RAM Holdings, Inc.*, 2007 WL 4465520, at *1 (Del. Ch. Dec. 13, 2007) ("[I]t is improper for witnesses to opine on legal issues governed by Delaware law.  It is within the exclusive province of this Court to determine such issues of domestic law.  I . . . need not—indeed, *may not*—look beyond the well-established precedent of the Delaware courts, with which I am intimately familiar.").

16

**STRINE, Chief Justice, with whom DANBERG, Judge joins, Dissenting:**

The majority has stated its position well and clearly. I just come to a different conclusion regarding the singular issue before us, which is whether there was sufficient evidence in the record from which a jury could rationally find that State Farm had acted in bad faith in addressing Enrique's claim.[1] In my view, evidence of bad faith sufficient to create a genuine dispute of fact to be decided by a jury existed.

After the physician who State Farm suggested do an IME found that Enrique's "condition was caused by the September 26, 2005 accident," State Farm had an adjuster of its own choosing, J.R. Roach, value Enrique's claim.[2] Roach did so at a range of $62,080 to $94,960. But, State Farm never made Enrique an offer in that range. Instead, State Farm went to its next "adjuster," who was the trial attorney for State Farm during the damages case that preceded this bad faith action, and who valued Enrique's claim at between $45,000 and $50,000. State Farm never made a settlement offer to Enrique above $25,000 until the eve of trial, at which point it offered only $45,000.

Based on these contentions (and details in the record that support them), Enrique argues that State Farm, whose exposure was capped at $100,000, made a calculated decision to not pay her anything near the policy limits. In support of that, she notes that

---

[1] *See Am. Ins. Grp. v. Risk Enter. Mgmt. Ltd.*, 761 A.2d 826, 829 (Del. 2000); *see also Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962) ("Under no circumstances . . . will summary judgment be granted when, from the evidence produced, there is a reasonable indication that a material fact is in dispute. Nor will summary judgment be granted if, upon an examination of all the facts, it seems desirable to inquire thoroughly into them in order to clarify the application of the law to the circumstances." (citation omitted)).

[2] *See* App. to Opening Br. at 264 (Letter from Dr. Lawrence Piccioni to J.R. Roach).

even Roach's range was below the policy limits, setting up the insurer to seek a discount off the limits. She also notes that State Farm knew she was unemployed, and was therefore under economic pressure to settle. That the trial attorney and ultimate adjuster who gave the later, much lower valuation in the underlying matter had his own reading of the medical record than did Roach does not mean that there is no genuine issue of material fact. Rather, it raises exactly the kind of credibility question that is for a jury to resolve. That is especially true when the insurer continued to raise other speculative issues of causation that it had an opportunity to explore and appears to have failed to do so. Even if one ignores the reality that the jury verdict was six times the final offer and two-and-a-half times the policy limits, the insurer never made an offer at the low range of its own valuation and its final offer was less than half the policy limits.

Unlike the Majority, I do not find it dispositive that the record suggests that State Farm made some requests for more information to which Enrique arguably did not respond. In the summary judgment context, that one part of the record cannot bear the weight placed upon it, especially because Enrique had cooperated in an IME by a physician of State Farm's choosing, and because State Farm never asked for yet another. Nor does State Farm seem to have asked Enrique for a release so that it could procure the records for itself.[3]

---

[3] *See Green v. Bloodsworth*, 501 A.2d 1257, 1260 (Del. Super. 1985) ("The Court takes judicial notice of the practice in this jurisdiction that authorizations for release of medical information are routinely provided by plaintiffs in personal injury cases upon request of defense counsel. It is expected that this practice will continue."); *see also* 6 COUCH ON INSURANCE § 82:18 (3d ed. 2015) (explaining that although "[a]s a general rule, there is no duty to engage in an independent

Put simply, there is evidence in the record that would support a conclusion that State Farm knew that Enrique was economically vulnerable and under pressure to settle for that reason, knew that her claim was worth much more than the values they offered her, and sought to have her accept a compromise that was unfair to her. In reaching the conclusion that this matter was one for the jury to resolve, I also recognize a reality: Insurers have economic incentives to pressure claimants in immediate need of cash into accepting offers that are tangible but below the policy limits and what is reasonable to compensate the claimant fairly for their injuries and other losses. Whether such incentives motivated State Farm here is not the question on appeal.

It may very well be that a jury, after hearing testimony from State Farm's adjustors and Enrique's expert witness—who has opined that State Farm acted in bad faith[4]—would conclude that State Farm acted in the utmost good faith. But, it may also be that a jury would conclude just the opposite. Because a reasonable jury could find that State Farm acted in bad faith, I respectfully dissent and would reverse the Superior Court's grant of State Farm's motion for summary judgment.

---

investigation of the proposed insured's health[,] . . . [i]t is common for applications for certain types of insurance to include a provision by which applicants agree to the release of medical information from their treating physicians for a specified period of time"); 9 AM. JUR. TRIALS 131, § 38, Westlaw (database updated 2016) ("The insurer usually requests, as part of the proofs of claim, the signing of authorizations to hospitals, doctors, and others. Although, ordinarily, there is no legal obligation to supply these authorizations, they should be given as a matter of good tactics and good will.").

[4] *See* App. to Opening Br. at 244–46 (Deposition of Ivan E. Cohen, Apr. 28, 2015).