IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DEBRA BENNETT & WILLIAM BENNETT, | § § | No. 144, 2016 |
| Plaintiff-Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. S10C-02-010 |
| USAA CASUALTY INSURANCE | § | |
| COMPANY, | § | |
| Defendant-Below, | § | |
| Appellee. | § | |

Submitted: February 15, 2017
Decided: March 13, 2017

Before **STRINE**, Chief Justice; **VALIHURA**, and **SEITZ**, Justices.

## ORDER

This 13th day of March, 2017, having considered the briefs and the record below, it appears to the Court that:

(1) On February 12, 2009, the Bennetts' toilet cracked causing water damage to their condominium as well as their belongings. The property was governed by a condominium association, which had insurance with Philadelphia Indemnity Insurance Company ("PIIC"). The Bennetts also had their own insurance policy with USAA. After the condominium association, USAA, and PIIC refused to cover the loss, the Bennetts filed suit against them alleging breach

of contract and bad faith denial of insurance coverage. This appeal involves only the suit against USAA.

(2) At trial, USAA moved for a directed verdict on the bad faith claim, contending that the Bennetts failed to present evidence that USAA lacked a reasonable justification to deny their claim. The Superior Court granted the motion, and instructed the jury that the bad faith claim was no longer in the case. After trial, the jury returned a verdict in favor of USAA on the breach of contract claim. In this appeal, the Bennetts raise two arguments. First, they contend that the Superior Court improperly required them to produce evidence that USAA did not have a reasonable justification for denying their claim. Second, they argue that the court should not have told the jury that the bad faith claim was no longer in the case. For the reasons stated below, we affirm the decision of the Superior Court.

(3) William and Debra Bennett owned a condominium in Lewes, Delaware.[1] On February 12, 2009, the property manager of their condominium association, Plantations East Condominium Association (the "Association"), called them and told them that neighbors had reported water gushing out of the walls of their home. The Bennetts called ServPro of Sussex County at the Association's recommendation. ServPro determined that the source of the leak was a broken toilet in the Bennetts' condominium.

---

[1] The Bennetts' primary home is in Ashburn, Virginia, but they stayed in the condominium year round.

(4)    The Bennetts sustained major water damage to their condominium and their personal property inside the home.  They filed a claim with their insurance company, USAA.  The USAA policy contained an "other insurance" provision, which stated that if the condominium was covered by other insurance "in the name of a corporation or association of property owners covering the same policy," the USAA policy would be secondary to that policy.[2]  USAA requested that the Bennetts provide a copy of the Association's bylaws so that it could determine who was responsible for the repairs.  Mr. Bennett forwarded them to USAA.[3]  The Bennetts also filed a claim with the Association and the Association's insurance carrier, PIIC.[4]  The Bennetts later hired an attorney, Georjan Overman, to handle the claims against the Association and PIIC.

(5)    There were significant delays in getting PIIC and the Association to pay for repairs to the property.  On May 21, 2009, Mr. Bennett sent an e-mail to USAA stating "[a]s you were informed by our attorney, Georjan Overman, the actual repair to our property is presently in limbo despite the [Association's] insurer, [PIIC], accepting the claim to repair the damaged structure."[5]  In the summer of 2009, the Bennetts agreed to mediate their claim with the Association

---

[2] App. to Answering Br. at 369-70.
[3] *Id*. at 79.
[4] *Id*. at 137.
[5] *Id*. at 142.

and PIIC to move the repair process along.[6]   USAA was not involved in the mediation.[7]   During that time, the Bennetts did not request that USAA pay for repairs to the condominium.

(6)     While the Bennetts were pursuing their claims against the Association and PIIC, USAA requested that the Bennetts provide a list of items damaged by the leak.[8]   On October 19, 2009, the Bennetts first mailed USAA their list.[9]   On December 17, 2009, a USAA adjuster inspected the condominium and prepared an estimate of the loss.  USAA paid a portion of the amount the Bennetts requested for their damaged personal property.  On January 28, 2010, the Bennetts contacted USAA to inform them that PIIC and the Association had not paid any benefits for their unit repairs, and demanded benefits under their dwelling coverage with USAA.  On January 29, 2010, USAA sent a denial letter to the Bennetts, informing them that USAA's coverage was secondary to that of the Association, and requested that if their claim was denied by PIIC, that they forward the denial letter to it for review.[10]

---

[6] *Id*. at 144-45.
[7] *Id*. at 145.
[8] App. to Answering Br. at 145.
[9] *Id*. at 159.
[10] App. to Opening Br. at 1.

4

(7)     On February 9, 2010, the Bennetts filed suit against USAA for breach of contract and bad faith.[11]  At their jury trial, the Bennetts testified in their case-in-chief regarding the damages to their condominium and personal property.  A contractor witness also testified.  The Bennetts did not call a representative from USAA to explain what information USAA knew or considered in rendering its decision to deny the claim.[12]

(8)     At the conclusion of the Bennetts' case, USAA moved for a directed verdict on the bad faith claim, arguing that the Bennetts failed to present sufficient evidence to support the claim.  Specifically, USAA argued that the Bennetts had the burden to produce some evidence to show that USAA lacked a reasonable justification to deny primary dwelling coverage.  During argument on the motion, the court asked why the Bennetts did not call a USAA representative as a witness:

> Court:     Let me just – let me ask one thing.  I would have thought that you would have had Ms. Johnson testify to explain why she did what she did.  Was there any reason why you didn't do that, Mr. Schaffer?
>
> Counsel:     Yeah, Your Honor.  There are risks, of course, that she could get on the stand and say, I did do that.[13]
>
> . . .

---

[11] The Bennetts filed a separate lawsuit against the Association and PIIC seeking payment for the same repairs. App. to Answering Br. at 169-70.

[12] A USAA claims representative, Lisa Johnson (formerly Lisa Bowman), testified during USAA's case-in-chief.  She was not asked why she denied the claim.

[13] App. to Answering Br. at 287.

5

Court:      Your – Ms. Bennett did say that Ms. Bowman did not ask for the insurance policy and I think she said she didn't look at it or that she was surprised that Ms. Bowman did not look at it. I don't know how Ms. Bennett would have actual knowledge of that. She may. Someone could have told her. Ms. Bowman could have told her. I doubt that, but she could have learned it through the litigation . . . But I'm certainly very troubled that we didn't have Ms. Bowman on the stand to say why she did what she did or why she didn't do what she didn't do and, you know – but what I'm left with right now is USAA paid on the personal property; the condo docs were sent to USAA; USAA, through great effort by Mr. Greenberg, was aware of the lawsuits against both the condo association and the Philadelphia Indemnity Insurance Company, but I – as I sit here, I don't know at all why Ms. Bowman did or [did] not do anything. I mean, I don't know.

Counsel:    Well, I believe the burden is that . . . someone at USAA . . . has to testify that she had a reasonable basis for denying these claims. And if she didn't read the insurance policy, I don't see how that is reasonable.

Court:      I mean, I think you have the burden to say they denied it without any reasonable justification.

Counsel:    Which we did.

Court:      I really have no information as to why she denied it.

Counsel:    So then how do we know whether their excuse is reasonable or not?

Court:      Well, you put her on the stand and ask her, [w]hy did you deny it? And she says, [w]ell, I did 10 things, or, [e]very 29ᵗʰ, I deny all the claims that come in just as a matter of company policy. That's just what I do and I get a bonus for doing that. I'm being facetious, but I don't—

Counsel:    Yeah.

6

Court:       —know.  I mean, I just don't know.

Counsel:     No, it was a good example.

Court:       I don't know why she did what she did.

. . .

Court:       There's a complete absence of — like I said, you've got the burden.  You've got the burden.[14]

(9)     On February 18, 2016, the trial court granted USAA's motion for a directed verdict on the bad faith claim, finding that the Bennetts failed to provide legally sufficient evidence to support their claim that USAA did not have a reasonable justification when it denied their coverage.  Specifically, the court held that because the Bennetts did not call USAA to explain why it denied the Bennetts' coverage, a jury could not find that USAA lacked a reasonable basis to deny their claim.  Thus, they failed to meet their burden of production on the issue.

(10)     On February 19, 2016, the Bennetts requested that the Superior Court reconsider its directed verdict ruling, which the court denied.  The court held that the Bennetts had made a strategic decision not to call anyone from USAA because they might provide an adequate explanation for why they denied the claim, and without that testimony the claim failed.[15]  On February 23, 2016, the Bennetts renewed the motion to reconsider the directed verdict.  The court denied the

---

[14] *Id*. at 289-92.
[15] *Id*. at 313.

motion, holding that the Bennetts "simply failed on this burden of proof to show those things, and so I ruled against [them] on bad faith."[16]

(11) On February 23, 2016, the court instructed the jury. Because counsel had discussed the bad faith claim in opening statements, and the court had granted a directed verdict on the claim, the court instructed the jury that the claim was no longer in the case:

> During opening statements, the attorneys discussed the parties' claims which you may need to decide in this case. The plaintiffs have the burden of proof for each and every claim they assert against the defendant. Based on the evidence presented by the plaintiffs in this case, I have ruled as a matter of law that the plaintiffs failed to meet their burden of proof on their claim that the defendant acted in bad faith. Therefore, this claim is not for you to decide and is no longer in this case.[17]

On the same day, the jury returned a verdict in favor of USAA on the breach of contract claim. This appeal followed.

(12) The Bennetts first argue that the Superior Court improperly granted a directed verdict on the bad faith claim. According to the Bennetts, USAA, not they, were required to provide evidence that the denial was not arbitrary, and thus a directed verdict was improper. A claim that the trial court applied an incorrect legal standard is a question of law that we review *de novo*.[18] Under Superior Court Civil Rule 50(a), the Superior Court may grant judgment as a matter of law when

---

[16] *Id.* at 328.
[17] *Id.* at 338-39.
[18] *MCA, Inc. v. Matsushita Elec. Indus. Co., Ltd.*, 785 A.2d 625, 638 (Del. 2001) (internal citation omitted).

8

the plaintiff "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  On appeal from the Superior Court's grant of a directed verdict, we must determine "whether the evidence and all reasonable inferences that can be drawn therefrom, taken in a light most favorable to the nonmoving party, raise[s] an issue of material fact for consideration by the jury."[19]

(13)  An insured has a cause of action for bad faith against an insurer "when the insurer refuses to honor its obligations under the policy and clearly lacks reasonable justification for doing so."[20]  To state a bad faith claim, the *plaintiff* must show that the insurer failed to honor its contractual obligations without reasonable justification.[21]  When evaluating whether there was a reasonable

---

[19] *Fritz v. Yeager*, 790 A.2d 469, 470-71 (Del. 2002) (internal citations omitted).

[20] *Enrique v. State Farm Mut. Auto. Ins. Co.*, 142 A.3d 506, 511 (Del. 2016).

[21] *Id.* (affirming summary judgment because the plaintiff did not meet his burden to show that the insurance company acted in bad faith); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 440 (Del. 2005); *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 264 (Del. 1995) ("A lack of good faith, or the presence of bad faith, is actionable *where the insured can show* that the insurer's denial of benefits was clearly without any reasonable justification.") (emphasis added); *Lewis v. Am. Indep. Ins. Co.*, 2004 WL 1426964, at *10 (Del. Super. June 22, 2004) (stating that *plaintiff* must show that the insurer's refusal to comply with contractual obligation was clearly without any reasonable justification) (quoting *Casson v. Nationwide Ins. Co.*, 455 A.2d 361, 365 (Del. Super. 1982)); *Thomas v. Harford Mut. Ins. Co.*, 2003 WL 220511, at *3 (Del. Super. Jan. 31, 2003) ("In order to establish bad faith breach of contract in the insurance context, *the plaintiff* must show that the insurer failed to honor its contractual obligations without reasonable justification.") (emphasis added); *Casson*, 455 A.2d at 365 (Del. Super. 1982) ("In order *for an insured to establish* the contractual liability of an insurer for an alleged breach of an insurance agreement, *he must show* that (1) there was a valid contract of insurance in force at the time of the loss, (2) the insured has complied with all conditions precedent to the insurer's obligation to make payment, and (3) the insurer has failed to make payment as required under the policy.") (emphasis added).

justification for denying the claim, "the strategy, mental impressions and opinion of the insurer's agents concerning the claim . . ." are of central importance.[22]

(14) Giving the Bennetts all reasonable inferences drawn from the evidence, and viewing the evidence in a light most favorable to them, they failed to raise a material fact for consideration by the jury on their bad faith claim. The only evidence the Bennetts presented on the bad faith claim was that they never gave a copy of the PIIC insurance policy to USAA. But that is insufficient evidence to prove that USAA failed to honor its contractual obligations without reasonable justification. The Bennetts notified USAA that PIIC and the Association were going to cover the claim, which would relieve USAA of secondary liability for the claim.[23] When the claim had not been paid nearly a year after the loss, the Bennetts asked USAA to cover the claim. USAA denied coverage because "the Insured's policy is a secondary policy to the Association's insurance coverage. If you have a denial letter from the Association's insurance carrier, please forward it to USAA for review."[24] The Bennetts did not admit PIIC's denial letter into

---

[22] *Tackett*, 653 A.2d at 263 (quoting *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992)); *see also Desrivieres v. Richard*, 2016 WL 241373, at *4 (Del. Super. Jan. 14, 2016) ("A first-party insured may establish a claim of bad faith in a first-party insured-insurer contractual relationship if they show that the insurer lacked reasonable justification in delaying or refusing payment of a claim. In this context, the mental impressions, strategy, and opinions of the insurer's agents concerning the handling of the claim are directly at issue.") (internal quotations omitted).
[23] App. to Answering Br. at 142.
[24] *Id*. at 1.

10

evidence and it is not in the record. In fact, it is unclear whether the Bennetts ever gave USAA the PIIC denial letter.

(15) Additionally, the Bennetts both testified that they were unaware of why USAA denied the claim, and they did not call a representative from USAA to give an explanation. Nor did the Bennetts call an insurance expert to opine on the arbitrariness of USAA's action. Further, when the Superior Court asked the Bennetts' counsel why he did not call a USAA representative to elicit their explanation, counsel said he did not want to risk presenting evidence that USAA had a reasonable basis for the denial. Although the Superior Court incorrectly held that the Bennetts had to call a representative from USAA to explain the basis for the denial, the court properly granted a directed verdict in USAA's favor because the Bennetts did not produce any evidence in their case-in-chief to support a bad faith claim.

(16) Next, the Bennetts challenge the Superior Court's jury instructions on two grounds. First, the Bennetts argue that the instruction improperly placed the burden of proof on them to show that USAA's denial of the claim was unreasonable. We have already determined that the Superior Court properly assessed the burden of proof against the Bennetts, and thus this claim is without merit. Second, the Bennetts argue that the instruction was prejudicial because it

did not clarify that the breach of contract claim was still alive. We review a challenged jury instruction *de novo*.[25]

(17) This Court determines whether, reading a jury instruction as a whole, the instruction "correctly stated the law and enabled the jury to perform its duty."[26] Further, an instruction will not be cause for reversible error if it is "reasonably informative and not misleading, judged by common practices and standards of verbal communication."[27] A jury instruction is not a ground for reversal if "it is reasonably informative, not misleading and does not undermine the jury's ability to intelligently perform its duty."[28]

(18) In opening statements, counsel for the Bennetts and USAA told the jury that the case was about a bad faith insurance claim and breach of contract claim. The Superior Court therefore determined that an instruction was needed to clarify that the bad faith claim was no longer in the case so that the jury would not be confused. The court may properly inform the jury that a claim is no longer part of a case to avoid confusion.[29] The instruction addressed a logical question that the jury might have had given that the attorneys explained the claims in opening

---

[25] *Chrysler Corp v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1034 (Del. 2003).

[26] *Id*. (citing *Russell v. K-Mart Corp*., 761 A.2d 1, 4 (Del. 2000)).

[27] *Sammons v. Doctors for Emerg. Servs., P.A.*, 913 A.2d 519, 540 (Del. 2006) (internal quotations omitted).

[28] *Koutoufaris v. Dick*, 604 A.2d 390, 399 (Del. 1992) (citing *Sirmans v. Penn*, 588 A.2d 1103 (Del. 1991)).

[29] *See Capital Mgmt. Co. v. Brown*, 813 A.2d 1094, 1101 (Del. 2002) ("Simply telling the jury that a party is no longer part of the case for the purpose of avoiding confusion about the alignment of the parties does not violate [Delaware law].").

statements. Further, the jury was properly instructed on the claim of breach of contract after the court gave the clarifying instruction. Thus, viewing the instruction as a whole, the instruction correctly stated the law and enabled the jury to perform its duty.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

/s/ *Collins J. Seitz, Jr.*
Justice

13