# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CELESTIALRX INVESTMENTS, LLC
and KRITTIKA LIFE SCIENCES, LLC,

       Plaintiffs,

       v.

JOSEPH J. KRIVULKA; LEONARD
MAZUR; DONALD OLSEN; JJK
PARTNERS, LLC; MIST
ACQUISITION, LLC; MIST
PHARMACEUTICALS, LLC; MIST
PARTNERS, LLC; JAK INVESTMENT
PARTNERS, LLC; CRANFORD
PHARMACEUTICALS, LLC;
CRANFORD THERAPEUTICS, LLC;
HOLMDEL PHARMACEUTICALS,
LP; HOLMDEL THERAPEUTICS,
LLC; LMAZUR ASSOCIATES, JV; and
AKRIMAX PHARMACEUTICALS,

       Defendants,

       and

AKRIMAX PHARMACEUTICALS,
LLC,

       Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 11733-VCG

## MEMORANDUM OPINION

Date Submitted: October 20, 2016
Date Decided: January 31, 2017

Steven Schwartz, of SCHWARTZ & SCHWARTZ, Dover, Delaware; OF
COUNSEL: Benjamin C. Curcio, Paul F. Campano, Jessica A. Tracy, Michael D.

Zahler, of CURCIO MIRZAIAN SIROT LLC, Roseland, New Jersey, *Attorneys for Plaintiffs CelestialRX Investments, LLC, and Krittika Life Sciences, LLC*.

Garrett B. Moritz, John A. Eakins, Nicholas D. Mozal, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: Andrew E. Anselmi, Zachary D. Wellbrock, of MCCUSKER, ANSELMI, ROSEN & CARVELLI, P.C, Florham Park, New Jersey, *Attorneys for Defendants Joseph J. Krivulka, JJK Partners, LLC, JAK Investment Partners, LLC, Mist Acquisition, LLC, Mist Pharmaceuticals, LLC, Mist Partners, LLC, Cranford Therapeutics, LLC, and Holmdel Therapeutics, LLC*.

Samuel T. Hirzel, II, of HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware, *Attorney for Defendants Leonard Mazur and LMazur Associates, JV*.

Andrew D. Cordo, F. Troupe Mickler IV, of ASHBY & GEDDES, Wilmington, Delaware, *Attorneys for Defendant Donald Olsen*.

Jody C. Barillare, of MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; OF COUNSEL: Brian A. Herman, of MORGAN, LEWIS & BOCKIUS LLP, New York, New York, *Attorneys for Defendant Cranford Pharmaceuticals, LLC*.

Ryan P. Newell, Lauren P. DeLuca, of CONNOLLY GALLAGHER LLP, Wilmington, Delaware, *Attorneys for Defendant Holmdel Pharmaceuticals, LP*.

Phillip A. Rovner, Jonathan A. Choa, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Defendant Akrimax Pharmaceuticals LLC*.

GLASSCOCK, Vice Chancellor

This procedurally awkward and factually prolix Memorandum Opinion reserves outstanding Motions to Dismiss, in favor of consideration of Motions for Partial Summary Judgment, which appeared to offer low-hanging fruit which, if reaped at the outset, might avoid significant litigation effort. The two issues so addressed involve the standard of care in the governing limited liability company agreement, and the effect of a release agreement, entered by the principal of the main plaintiff here, on that entity's ability to proceed with its claims. Plucking that fruit has proved more difficult than I anticipated, and whether its elimination from the menu of this litigation will shorten the meal remains to be seen. With these issues resolved, at any rate, I encourage the parties to mediate this dispute, litigation of which will no doubt involve much more unpalatable effort.

This action arises out of an alleged conspiracy to funnel valuable pharmaceutical interests away from an entity in which the Plaintiff, CelestialRX, LLC ("CelestialRX"), is a member. The operative amended complaint brings sixteen different counts against over a dozen Defendants. The numerous Defendants have banded together into five groups; each group has moved to dismiss this action. Two groups have moved for partial summary judgment. The parties have identified two preliminary issues which, if decided, could significantly clarify the legal issues in this action. The first is whether a July 1, 2013 release (the "Release Agreement") bars causes of action brought by CelestialRX that accrued prior to the release. The

1

second is the extent to which the limited liability company agreement (the "LLC Agreement") and a July 1, 2013 amendment to that agreement ("Amendment No. 7") limit or modify fiduciary duties. This Memorandum Opinion addresses those preliminary issues.

Because these two preliminary issues were raised by Defendants' Motions for Partial Summary Judgment, I will address them under that standard. I am reserving decision on the outstanding Motions to Dismiss and will ask for further guidance from the parties in light of my decisions below on these two preliminary legal issues. I undertake this unusual procedure in the interest of efficiency.

## I. BACKGROUND[1]

This action involves a tangled web of pharmaceutical transactions, licensing, and sales agreements among various related entities. Thus this case's background is dense. The following provides a detailed but non-exhaustive overview of the context of this dispute sufficient to understand this Court's analysis of the two legal issues addressed: interpretation of the July 1, 2013 Release Agreement, and interpretation of certain duty-related provisions in the LLC Agreement and Amendment No. 7. A heavier focus is given to the pre-July 1, 2013 events as such context is helpful to understand the documents executed that day. There are substantial disputes in this

---

[1] Except where otherwise noted, the information in this section is undisputed and taken from the verified pleadings, affidavits, and other evidence submitted to the Court. Reasonable inferences are drawn in favor of the non-moving party—the Plaintiffs here.

litigation arising after July 1, 2013; because of the nature of this Memorandum Opinion, those are discussed with less detail. The casual reader may be satisfied with the brief summary, below.

This action arises from allegedly improper self-dealing transactions by two members of a three-member limited liability company. The company, Akrimax Pharmaceuticals, LLC ("Akrimax" or the "Company"), is a Defendant in this action along with the two alleged wrong-doers—Joseph J. Krivulka and Leonard Mazur. The third member of Akrimax is itself a limited liability company, and brings this action challenging such transactions on various grounds. That third member, Plaintiff CelestialRX, is wholly owned by a non-party, Steve Laumas. Akrimax is a pharmaceutical business and engaged in a morass of licensing and sales agreements underlying this dispute. The Plaintiffs allege that Krivulka improperly inserted various entities that he controlled or was invested in (the "Middlemen Entities") as middlemen between Akrimax and other drug companies from whom Akrimax sought to receive drug rights. The Middlemen Entities received a cut of the sales or marketing performed by Akrimax. The favorability of the terms under which the Middlemen Entities were interposed between the company and third parties is heavily disputed.

In the Spring of 2013 Krivulka and his entities notified Akrimax of their intention to terminate Akrimax's rights to sell and distribute certain drugs.

Allegedly, this was the first time CelestialRX and Laumas learned of the Middlemen Entities' existence and dealings with Akrimax, and Laumas thereafter began investigating—and disputing the propriety of—Krivulka's actions. Ultimately a "settlement" was reached whereby the Middlemen Entities agreed that Akrimax would retain certain drug rights in exchange for paying additional fees, among other concessions. In connection with the settlement, Laumas (but, according to the Plaintiffs, not CelestialRX) released all claims against Krivulka and Mazur. These higher fees ultimately were not paid, allegedly as part of a scheme by Krivulka to damage Akrimax, and Akrimax eventually lost the rights returned to it via the settlement. CelestialRX brings this action alleging misconduct by Krivulka and others for almost every transaction between Krivulka's related entities and Akrimax.

*A. Parties*

1. The Plaintiffs

Plaintiff CelestialRX is a Delaware limited liability company with its principal place of business in Old Greenwich, Connecticut.[2] CelestialRX's sole member and manager is Sandeep "Steve" Laumas ("Laumas").[3] The Plaintiff, CelestialRX, is a member of the Defendant, Akrimax.[4]

---

[2] Transmittal Aff. of Michael D. Zahler, Esq., in Support of Pls' Opposition to Motions for Summary Judgment and to Dismiss ("Zahler Aff.") at Ex. 1 (the "Amended Complaint" or "Compl.") ¶ 4.

[3] Compl. ¶ 4; Pls' Answering Br. in Opposition to Krivulka Defs' Motions 6 ("Laumas is the sole member of CelestialRX and Krittika.").

[4] Compl. ¶ 4.

Plaintiff Krittika Life Sciences, LLC ("Krittika") is also a Delaware limited liability company and shares a principal place of business with CelestialRX in Old Greenwich, Connecticut.[5] Krittika's sole member is Laumas and, as with CelestialRX, Laumas manages Krittika.[6] Krittika is a consulting entity which had a contractual relationship with Defendant Akrimax.[7]

### 2. The Defendants

#### a. Nominal Defendant

Defendant Akrimax is a Delaware limited liability company that sells and markets "pharmaceutical products in the areas of cardiovascular medicine endocrinology and pain management."[8] Defendants Joseph Krivulka and Leonard Mazur were the initial members of Akrimax.[9] Plaintiff CelestialRX subsequently joined as a third member.[10] Akrimax is a nominal defendant for purposes of CelestialRX's claims, but is also a direct defendant for Krittika's breach of contract claims regarding its consulting agreement.[11]

---

[5] *Id.* at ¶ 5.
[6] *Id.*; Pls' Answering Br. in Opposition to Krivulka Defs' Motions 6 ("Laumas is the sole member of CelestialRX and Krittika").
[7] Compl. ¶ 3.
[8] *Id.* at ¶ 28; *See* Krivulka Defs' Opening Br. 9.
[9] Compl. ¶ 28.
[10] *Id.*
[11] *Id.* at ¶ 6.

### b. Individual Defendants

Defendant Joseph J. Krivulka ("Krivulka") is a resident of New Jersey and an investor in numerous pharmaceutical businesses.[12] He is an original member of Akrimax. Following the July 1, 2013 settlement and amendments Krivulka holds 100% of Akrimax's Common Voting Units and a majority of total units.[13] He became the sole Manager of Akrimax pursuant to the July 1, 2013 amendment.[14] Prior to the July 1, 2013 amendment the Manager of Akrimax was the Board of Directors "acting collectively."[15] Krivulka also has investments in various other entities including Mist Acquisition, LLC, Mist Pharmaceuticals, LLC, Mist Partners, LLC, JJK Partners, LLC, JAK Investment Partners, LLC, Holmdel Therapeutics, LLC and Cranford Therapeutics, LLC.[16]

Defendant Leonard Mazur ("Mazur") is a resident of New Jersey and co-founded Akrimax in 2007.[17] Between January 11, 2008, and July 1, 2013, Mazur

---

[12] *Id.* at ¶ 7; *See* Krivulka Defs' Opening Br. 8. (citing Compl. ¶ 7).

[13] *See* Transmittal Aff. of John A. Eakins, Esq., in Support of Krivulka Defs' Motions for Summary Judgment and to Dismiss ("Eakins Aff.") Ex. 45 at Ex. A.

[14] *See* Eakins Aff. Ex. 45 ¶ 6(b).

[15] *See* Eakins Aff. Ex. 2 § 4.01(b).

[16] *See* Compl. ¶ 7; Krivulka Defs' Opening Br. 8 (citing Compl. ¶ 7). Through his ownership interests in Holmdel Therapeutics Krivulka is also a minority equity holder in Holmdel Pharmaceuticals. Similarly, through his interest in Cranford Therapeutics Krivulka is also a minority equity holder in Cranford Pharmaceuticals.

[17] Compl. ¶¶ 8, 28.

served on Akrimax's board of directors with Krivulka and Laumas.[18]  Mazur, like Krivulka, has various investment interests outside his interest in Akrimax.

Defendant Donald Olsen ("Olsen") resides outside of Delaware, and is the former President and CEO of nominal defendant Akrimax.[19]

Before turning to the blizzard of entities involved in this matter, I note that the basic initial membership structure for Akrimax is set out in Figure 1 below.

**Figure 1**[20]



---

[18] Zahler Aff. Ex. 3 § 4.01(b); *See* Eakins Aff. Ex. 45 ¶ 6(b).
[19] Compl. ¶ 9; Def Olsen's Opening Br. 2.
[20] *See* Zahler Aff. Ex. 2 at Ex. A, Signature Page; Zahler Aff. Ex. 3 at Ex. A.  I have excluded North Sounds' Class A shares to avoid confusion.

### c. The Entity Defendants

There are numerous entity level defendants—some more relevant than others. Below is a brief description of each.

Defendant JJK Partners, LLC ("JJK Partners") is a Delaware limited liability company.[21] Krivulka is the sole member of JJK Partners.[22] Following Amendment No. 7 Krivulka holds his interest in Akrimax through JJK Partners—that is JJK Partners is a Member of Akrimax holding "Krivulka Units."[23] However, he initially held his interest in Akrimax in his own name.[24] Further, JJK Partners has a consulting agreement with Akrimax through which Krivulka receives his board fees.[25]

Defendant JAK Investment Partners, LLC ("JAK Investment Partners") is a Delaware limited liability company.[26] Krivulka is the sole member of JAK

---

[21] Zahler Aff. Ex. 5.
[22] *See* Zahler Aff. Ex. 7 at Ex. B.
[23] Eakins Aff. Ex. 45 at Ex. A (indicating JJK Partners is the member holding "Krivulka Units").
[24] *See* Eakins Aff. Ex. 2 at Ex. A.
[25] Zahler Aff. Ex. 25.
[26] Zahler Aff. Ex. 6. I note that JAK Investments, LLC was named in the Amended Complaint, but was dismissed via stipulation of the parties. *See* Compl. ¶ 13; Stipulation and Order Dismissing Defendant JAK Investments, LLC Without Prejudice (April 6, 2016). The Complaint alleged that Krivulka had signed documents on behalf of JAK Investments, LLC and held interests in certain entities via JAK Investments, LLC. *See* Compl. ¶ 13. Certain ownership documents were in fact errantly signed by JAK Investments, LLC, however it is now clear they should have referred to JAK Investment Partners. Stipulation and Order Dismissing Defendant JAK Investments, LLC Without Prejudice (April 6, 2016).

Investment Partners.[27]  Defendant Mist Partners, LLC was majority owned by JAK Investment Partners.[28]

Defendant Mist Partners, LLC ("Mist Partners") is a Delaware limited liability company and was formed in October 2009.[29]  Mist Partners was majority owned by JAK Investment Partners, which Krivulka beneficially owned.[30]  Mist Partners is the sole owner and member of Mist Acquisition, LLC.[31]

Defendant Mist Acquisition, LLC ("Mist Acquisition") is also a Delaware limited liability company formed in October 2009 and, as stated above, is wholly owned by Mist Partners.[32]  Krivulka has served as Chairman of Mist Acquisition, and Mazur has served as Vice Chairman.[33]  Mist Acquisition, as discussed below, engaged in a number of the transactions challenged in this litigation.

Defendant Mist Pharmaceuticals, LLC ("Mist Pharmaceuticals") is a Delaware limited liability company formed in June 2011.[34]  Mist Pharmaceuticals, at various points in this litigation held, distributed and revoked rights to sell or

---

[27] *See* Zahler Aff. Ex. 8 at Signature Block, Ex. B.
[28] *See* Compl. ¶ 14; Krivulka Defs' Opening Br. 12.
[29] Eakins Aff. Ex. 7 § 2.01.
[30] *See id.* at Ex. B; Stipulation and Order Dismissing Defendant JAK Investments, LLC Without Prejudice (April 6, 2016).
[31] *See* Eakins Aff. Ex. 8 at Ex. A.
[32] Eakins Aff. Ex. 8.
[33] Eakins Aff. Ex. 8 ¶ 7.
[34] *See* Zahler Aff. Ex. 14.

promote certain drugs at issue. Krivulka had an over ninety percent interest in Mist Pharmaceuticals.[35] Krivulka was Chairman of Mist Pharmaceuticals' board.[36]

Defendant Cranford Therapeutics, LLC ("Cranford Therapeutics") is a Delaware limited liability company formed in October 2013 by Krivulka.[37] Krivulka, through JJK Partners, held a majority interest in Cranford Therapeutics.[38] Defendants Olsen and Mazur also held equity in Cranford Therapeutics.[39] Cranford Therapeutics owns a minority interest of approximately twelve percent in Defendant Cranford Pharmaceuticals, LLC.[40]

Defendant Cranford Pharmaceuticals, LLC ("Cranford Pharmaceuticals") is a Delaware limited liability company and was also formed by Krivulka in October 2013.[41] Krivulka has served as CEO of Cranford Pharmaceuticals.[42] The majority equity holder of Cranford Pharmaceuticals is a third-party investor—Juggernaut Capital.[43] Cranford Pharmaceuticals engaged in a number of the transactions which the Plaintiffs challenge in this litigation.

---

[35] Eakins Deposition Aff. Ex. A at 19:15–18 (Krivulka); Zahler Aff. Ex. 15 at Ex. B.
[36] Zahler Aff. Ex. 15 § 6.01(b).
[37] Zahler Aff. Ex. 18.
[38] Zahler Aff. Ex. 19 at Ex. B.
[39] *Id.*
[40] *See* Eakins Aff. Ex. 58 at Ex. A.
[41] Zahler Aff. Ex. 20.
[42] Eakins Aff. Ex. 58 § 4.03(a).
[43] *Id.* at Ex. A (indicating Juggernaut Capital contributed $22 million, whereas Cranford Therapeutics contributed on $3 million).

10

Defendant Holmdel Therapeutics, LLC ("Holmdel Therapeutics") is a Delaware limited liability company formed in December 2012.[44] Defendant Krivulka, through JJK Partners, owns 50.05% of Holmdel Therapeutics.[45] Defendant Mazur, through his entity LMazur Associates JV, owns 25% of Holmdel Therapeutics.[46] Holmdel Therapeutics is a limited partner in Holmdel Pharmaceuticals, LP, and holds an approximately 13% stake as a minority investor.[47]

Holmdel Pharmaceuticals, LP ("Holmdel Pharmaceuticals") is a Delaware limited partnership formed in December 2012.[48] Holmdel Pharmaceuticals' general partner is HP General Partner LLC,[49] which is controlled by unrelated third-party SWK.[50] SWK contributed approximately $13 million in capital whereas Holmdel Therapeutics contributed approximately $2 million.[51] Holmdel Pharmaceuticals acquired and transferred rights to certain drugs at issue in this litigation.

Defendant LMazur Associates JV ("LMazur") is an entity which had a consulting agreement with Akrimax.[52] Defendant Mazur received his board fees via LMazur. Defendant Mazur also made investments in various entities via LMazur.

---

[44] Zahler Aff. Ex. 17.
[45] Eakins Aff. Ex. 24 at Ex. B.
[46] *Id.*
[47] Eakins Aff. Ex. 25 at Partner Schedule.
[48] *Id.* at Recitals.
[49] *Id.* at Partner Schedule.
[50] *See* Eakins Aff. Ex. 67 at Note 1.
[51] Eakins Aff. Ex. 25 at Partner Schedule.
[52] *See* Zahler Aff. Ex. 24.

d. Defendant Groups

Given the number of Defendants in this litigation, it is helpful to note that the Defendants have formed the five groups discussed below.

The first group of Defendants is the "Krivulka Defendants" which consists of the following: Joseph Krivulka, JJK Partners, JAK Investment Partners, Mist Acquisition, Mist Pharmaceuticals, Mist Partners, Cranford Therapeutics and Holmdel Therapeutics. The Krivulka Defendants have moved to dismiss each count against them, and for partial summary judgment on each of the two preliminary issues.

The next group of Defendants, the "Mazur Defendants," consists of Defendants Leonard Mazur and LMazur. The Mazur Defendants have moved to dismiss each count against them for lack of personal jurisdiction and failure to state a claim, and for partial summary judgment regarding the preliminary issue of the effect of the July 1, 2013 release.

Defendant Olsen is on his own, and has moved to dismiss for lack of personal jurisdiction and failure to state a claim. Similarly, Defendant Holmdel Pharmaceuticals is on its own, and has moved to dismiss for failure to state a claim. Finally, Cranford Pharmaceuticals is on its own and has moved to dismiss for failure to state a claim.

*B. Akrimax's Beginnings and Select Transactions*[53]

Akrimax was formed by Krivulka and Mazur on October 24, 2007.[54] There was no initial capital contribution by Krivulka or Mazur.[55] On January 11, 2008, Akrimax amended its governing documents to permit an investment by a hedge fund, North Sound Capital.[56] Laumas previously worked at North Sound Capital, however at the time of North Sound's investment he was no longer at the hedge fund.[57] North Sound invested $35 million and received 35,000,000 non-voting, Class A preferred units.[58] The record indicates that in connection with this investment, which Laumas was involved in facilitating, CelestialRX, Laumas' entity, received 49% of Akrimax's common voting units.[59] Thus the common voting units, as outlined in Figure 1, were initially distributed as follows, 49% to CelestialRX, 25.5% to Mazur, and 25.5% to Krivulka.[60] These voting shares appear to have been received without capital contribution, and the initial capital came from North Sound.[61]

---

[53] I note other transactions involving the drugs InnoPran XL and Suprenza, for example, occurred between formation and July 1, 2013 and were mentioned in the briefing. However, because they were not heavily emphasized I chose to omit them from this background section for efficiency.

[54] Zahler Aff. Ex. 2 at Recitals.

[55] *See id.* at Ex. A.

[56] *See* Eakins Aff. Ex. 2 at Recital C.

[57] Eakins Deposition Aff. Ex. B at 33:12–21 (Laumas).

[58] *See* Krivulka Defs' Opening Br. 11 (citing Eakins Aff. Ex. 2); Pls' Answering Br. in Opposition to Krivulka Defs' Motions 5 (citing Zahler Aff. Ex. 3).

[59] *See* Zahler Aff. Ex. 3 at Ex. A.

[60] *See id.*

[61] *See* Zahler Aff. Ex. 2 at Ex. A; Pls' Answering Br. in Opposition to Krivulka Defs' Motions 13 (indicating the "sole source" of initial capital was the $35 million from North Sound).

Akrimax's January 11, 2008 Second Amended LLC Agreement provided that the initial directors "shall be Joseph Krivulka, Len Mazur and Steve Laumas,"[62] and that each director had one vote.[63] Further, it provided that the Manager of the Company was the Board of Directors acting collectively.[64] The Second Amended LLC Agreement contained various provisions modifying fiduciary duties.[65]

### a. Rouses Point and Inderal

Also on January 11, 2008, Akrimax purchased a manufacturing facility in Rouses Point, New York from Wyeth Pharmaceuticals for $20 million.[66] As part of a separate agreement executed the same day Akrimax purchased rights to Inderal and certain other drugs for $12 million from Wyeth Pharmaceuticals.[67] Thus Akrimax's early productive assets were the facility and the drug rights purchased from Wyeth. Later that year, Rouses Point Pharmaceuticals ("RPP") was formed.[68] Krivulka and Mazur collectively hold a controlling interest in RPP.[69] Akrimax

---

[62] Eakins Aff. Ex. 2. § 4.01(b).
[63] *Id.* at § 4.01(c).
[64] *Id.* at § 4.01(b).
[65] *Id.* at §§ 4.01(h), 8.01–02.
[66] Eakins Aff. Ex. 4 § 2.1.
[67] Eakins Aff. Ex. 3 § 2.1.
[68] Zahler Aff. Ex. 27.
[69] Zahler Aff. Ex. 28 at Ex. A; Krivulka Defs' Opening Br. 52.

appointed RPP as the exclusive distributor of Propranolol ER, an Inderal generic, on February 9, 2009.[70]

### b. NitroMist

On October 27, 2009 Mist Acquisition entered into a transaction with a third party, NovaDel Pharma Inc. ("NovaDel") to acquire the rights to the drug NitroMist via a License and Distribution Agreement.[71] To secure the rights, Mist Acquisition agreed to pay NovaDel an up-front fee of $1 million, milestone payments, and performance payments.[72] Two days later, on October 29, 2009, Mist Acquisition entered into a Commercialization, Distribution, and Support Services Agreement with Akrimax (the "NitroMist Services Agreement").[73] Via the NitroMist Services Agreement, Akrimax was assigned Mist Acquisition's right to distribute NitroMist in exchange for Akrimax assuming the responsibilities of the October 27, 2009 License Agreement, excluding the $1 million up-front payment in the License Agreement,[74] and agreeing to pay Mist Acquisition a royalty on net sales.[75] Thus Akrimax was able to receive the rights, without the substantial upfront payment; however, if certain milestones were met, deferred payments totaling $1 million

---

[70] Zahler Aff. Ex. 29 at 33–34. Rouses Point Pharmaceuticals, as a result of the agreement, was responsible for paying Akrimax a service fee of 60% of Propranolol ER's gross profit. *Id.* I note, the term of this deal was five years. *See id.*

[71] Eakins Aff. Ex. 9.

[72] *See id.* at §§ 4.1–4.3.

[73] Eakins Aff. Ex. 10.

[74] *See id.* at §§ 3.5(h), 4.1.

[75] *See id*. at §§ 4.1, 4.2.

15

would be owed by Akrimax to Mist Acquisition.[76]  Additionally, Akrimax was required to make a $45,000 per quarter distribution fee payment to Mist Acquisition for four quarters.[77]

### c. Tirosint

On January 27, 2010 Akrimax entered into a Promotion Agreement (the "Tirosint Agreement") with Alpharma Pharmaceuticals, LLC to market and distribute the drug Tirosint.[78]  The Tirosint Agreement provided Akrimax and its affiliates an exclusive right to promote, market, sell and distribute Tirosint.[79]  The Tirosint Agreement required Akrimax to expend millions per year on product promotion,[80] and required certain minimum product purchases per year.[81]

That same day, January 27, 2010, Akrimax assigned to Mist Acquisition all of its "rights and obligations" under the Tirosint Agreement.[82]  From the record developed at this point, it appears at the time of this transfer, there was no consideration rendered by Mist Acquisition other than assuming Akrimax's obligations under the Tirosint Agreement.[83]

---

[76] *Id.* at § 4.4.
[77] *Id.* at § 4.3.
[78] *See* Eakins Aff. Ex. 11.
[79] *Id.* at § 2.2.
[80] *Id.* at § 3.1.
[81] *Id.* at § 5.4.
[82] Eakins Aff. Ex. 12 ¶¶ 1–2.
[83] *See id.*; Eakins Deposition Aff. Ex. C at 91:3–11 (Mazur).

On December 7, 2011, Mist Acquisition entered into a Promotion, Distribution and Support Services Agreement (the "Tirosint Services Agreement") with Akrimax.[84] Pursuant to this agreement Akrimax would retain 90% of Tirosint's sales and would pay a 10% royalty to Mist Acquisition.[85] Further, the Tirosint Services Agreement was backdated to be effective as of January 27, 2010.[86] The Tirosint Services Agreement required the 10% royalty rate to be paid on accrued distributions since the promotion commencement date.[87] The favorability of these terms is disputed—the Krivulka Defendants argue the transfer occurred after Tirosint's launch, which presumably required some expenditure by Mist, and that the terms were favorable given Mist Acquisitions' "substantial assumption of obligations."[88] The Plaintiffs, for their part, assert that the transactions were "purposeless" and that "[b]ut for these purposeless transactions, Akrimax would have retained 100% of . . . gross sales."[89]

### d. Primlev

On October 3, 2011, Mist Pharmaceuticals entered into a Marketing Rights Agreement (the "Primlev Agreement") with unrelated third-parties Argent Development Group and Mikart, Inc. to acquire distribution rights for the drug

---

[84] Eakins Aff. Ex. 19.
[85] *Id.* at § 6.2.
[86] *Id.* at Recitals.
[87] *Id.* at § 6.3.
[88] Krivulka Defs' Opening Br. 14.
[89] Pls' Answering Br. in Opposition to Krivulka Defs' Motions 17.

Primlev.[90]  The Primlev Agreement required Mist Pharmaceuticals to pay a total of $1,923,581 over four years, with a $700,000 payment due upon closing.[91]  The Primlev Agreement indicated that Mist Pharmaceuticals "does not have a sales force," but that Akrimax does and desires to market and distribute Primlev on behalf of Mist Pharmaceuticals.[92]

The next day, October 4, 2011, Mist Pharmaceuticals entered into a Commercialization, Distribution and Support Services Agreement (the "Primlev Services Agreement") with Akrimax.[93]  This agreement provided Akrimax the ability to market and distribute Primlev in exchange for Akrimax bearing the "costs and expenses" associated with commercialization,[94] paying Mist Pharmaceuticals $1,503,000 in scheduled payments over four years—but with no up-front payment due upon closing,[95] and paying Mist Pharmaceuticals a 20% royalty on net sales.[96] Again the parties dispute the favorability of these terms.  The Plaintiffs assert Mist Pharmaceuticals is an unnecessary "middle man,"[97] whereas the Krivulka Defendants assert Akrimax did not have the resources to expend upfront and the

---

[90] Eakins Aff. Ex. 16.
[91] *Id.* at § 8.1.
[92] *Id.* at Recitals.
[93] Eakins Aff. Ex. 17.
[94] *Id.* at § 3.3.
[95] *Id.* at § 4.2.
[96] *Id.* at § 4.1.
[97] Pls' Answering Br. in Opposition to Krivulka Defs' Motions 18.

Primlev Services Agreement permitted them to generate revenue "without purchasing the rights."[98]

### C. The Settlement with Pfizer

In 2011 and 2012, an ongoing dispute between Akrimax and Pfizer was settled.[99] Pfizer had acquired Wyeth after Wyeth's January 11, 2008 transaction with Akrimax for the Rouses Point manufacturing facility and various drug rights, including Inderal. Pfizer alleged that Akrimax had failed to comply with its obligations arising from the January 2008 transactions.[100] Laumas voted in favor of the settlement with Pfizer.[101] Mazur also voted in favor of the settlement over Krivulka's objection.[102]

The settlement had two different agreements. The first was the Settlement Agreement entered on June 27, 2011.[103] The Settlement Agreement required Akrimax to return the Rouses Point manufacturing facility to Pfizer, along with the rights to Inderal and the other pharmaceutical products.[104] In exchange Pfizer released Akrimax of certain obligations—appearing to total upwards of $20

---

[98] Krivulka Defs' Opening Br. 16.
[99] *See* Eakins Aff. Ex. 71 at 9–10.
[100] *See* Eakins Aff. Ex. 13 at Recitals.
[101] Eakins Deposition Aff. Ex. B at 115:13–17 (Laumas).
[102] *See* Feb. 2, 2016 Krivulka Aff. ¶ 13.
[103] Eakins Aff. Ex. 13.
[104] *Id.* at Recitals, §§ 1.47, 1.94, 2.2.

million.[105]  That same day Pfizer and Akrimax entered into a License and Option Agreement.[106]  The License and Option Agreement permitted Akrimax to continue its sales of both Inderal and its generic version Propranolol ER,[107] and provided Akrimax the option to reacquire certain rights for $45,000,000.[108]

Thus, over Krivulka's objection, Laumas and Mazur voted to return the Inderal rights and the Rouses Point manufacturing facility to Pfizer.[109]  Each side has a different theory regarding the effect of this vote.  The Plaintiffs assert that this dispute between Mazur, Laumas, and Krivulka angered Krivulka; it motived him to, in bad faith, "exact revenge upon his partners" and Akrimax.[110]  The Krivulka Defendants' spin on the vote is that it fundamentally changed Akrimax as a company. The Defendants argue Akrimax "transitioned from an entity receiving revenues based on manufacturing" and revenue streams from its initial Inderal purchase in 2008, "to an entity earning revenues marketing and selling pharmaceuticals under rights acquired by other entities."[111]

---

[105] *See id.* at § 2.2; Krivulka Defs' Opening Br. 15 ("Pfizer released Akrimax's obligations of approximately $20 million.").

[106] Eakins Aff. Ex. 14.

[107] *Id.* at Recital B, Schedule 1.44.

[108] *Id.* at § 6.3.2.

[109] *See* Pls' Answering Br. in Opposition to Krivulka Defs' Motions 50.

[110] *Id.*; *See id.* at 114 ("Thus, Krivulka decided prior to July 1, 2013 that he didn't need those kind of partners [Laumas]; and he engineered the default as revenge for the vote.") (alterations in original) (internal quotations omitted).

[111] Krivulka Defs' Opening Br. 15.

*D. "For Convenience" Termination Provisions*

On February 23, 2011, the October 29, 2009 NitroMist Services Agreement between Mist Acquisition and Akrimax was amended.[112] The original NitroMist Services Agreement provided that Akrimax could terminate the agreement "for convenience" upon one hundred eighty days prior written notice, under certain conditions.[113] The 2011 amendment changed the "for convenience" termination provision by adding that *Mist Acquisition* may terminate the agreement and retake Akrimax's distribution rights "at any time for convenience upon thirty (30) days prior written notice."[114] The Plaintiffs argue this amendment was improper and done "with neither Laumas' knowledge nor consent."[115]

Regarding Primlev, the original October 4, 2011 Primlev Services Agreement between Mist Pharmaceuticals and Akrimax provided that Mist Pharmaceuticals may terminate the agreement "for any reason with a 30 day notice."[116] Similarly, regarding Tirosint, the original December 7, 2011 Tirosint Services Agreement between Mist Acquisition and Akrimax provided that Mist Acquisition may terminate the agreement "for convenience upon thirty (30) days' prior written notice to Akrimax."[117]

---

[112] Zahler Aff. Ex. 32.
[113] *See* Eakins Aff. Ex. 10 § 8.2(d).
[114] Zahler Aff. Ex. 32 § 8.2(f).
[115] Pls' Answering Br. in Opposition to Krivulka Defs' Motions 18.
[116] Eakins Aff. Ex. 17 § 8.1.
[117] Eakins Aff. Ex. 19 § 11.3(c).

*E. Spring 2013—Certain Akrimax Rights Are Terminated*

On April 12, 2013 a series of letters were sent providing Akrimax notice that its rights to Primlev, NitroMist, and Tirosint, were being terminated effective June 1, 2013, pursuant to the "for convenience" provisions described above.[118] Specifically, Mist Pharmaceuticals, via letter over Krivulka's signature, informed Akrimax that the Primlev Services Agreement was terminated.[119] Mist Acquisition, via letters over Krivulka's signature, terminated the NitroMist Services Agreement and the Tirosint Services Agreement.[120]

Following these termination letters, Laumas began requesting information from Akrimax.[121] Through the termination letters Laumas learned, purportedly for the first time, of the Mist entities' involvement with Akrimax.[122] On May 7, 2013 Laumas sent a flurry of emails requesting information from Akrimax.[123] On the evening of May 7, 2013, Laumas also sent Krivulka and Mazur a consolidated list of eighteen categories of documents he was requesting, which included account balances, employee credit card statements, and legal invoices.[124]

---

[118] *See* Zahler Aff. Ex. 37.
[119] *Id.*
[120] *Id.*
[121] *See, e.g.*, Zahler Aff. Ex. 38.
[122] *See* Compl. ¶¶ 60–62; *See also* Pls' Answering Br. in Opposition to Krivulka Defs' Motions 20 ("Thus, Laumas first discovered Mist Acquisition's and Mist Pharmaceutical's involvement with Tirosint, NitroMist, and Primlev from the April 12, 2013 termination letters.").
[123] *See* Zahler Aff. Exs. 39, 40, 41, 42, 43.
[124] Eakins Aff. Ex. 32.

Laumas was provided with much of the information and documents he requested. For example, Laumas was sent a disk containing various Akrimax contracts, after which he requested further information about particular drugs.[125] He was also given various financial statements.[126] Laumas indicated that he was gathering this information to inform his decision to enter "some kind of settlement agreement with Joe [Krivulka]."[127]

*F. The July 1, 2013 "Settlement"*

1. The Lead Up

The record reflects that on May 28, 2013, Mazur and Laumas, over Krivulka's objection,[128] voted to retain Reitler Kailas & Rosenblatt LLC ("Reitler") on behalf of the Akrimax board of directors.[129] A complaint was drafted by Reitler, dated May 29, 2013, with Akrimax as the plaintiff and Krivulka, Mist Pharmaceuticals, and Mist Acquisition as the defendants.[130] Laumas worked together with Mazur in preparing the complaint, but it was not filed.[131] The draft complaint alleged several counts including conversion, breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, and fraud.[132] The counts in the draft complaint arose out of many

---

[125] Eakins Aff. Exs. 34, 36.
[126] *See* Eakins Aff. Exs. 28, 29, 31, 33, 35.
[127] Eakins Deposition Aff. Ex. B at 184:7–21 (Laumas).
[128] *See* Eakins Aff. Ex. 37.
[129] *See* Eakins Aff. Ex. 38.
[130] Eakins Aff. Ex. 39 at 1, 21.
[131] Eakins Deposition Aff. Ex. B at 204:12–206:23 (Laumas).
[132] Eakins Aff. Ex. 39 ¶¶ 60–75.

of the pre-July 1, 2013 transactions at issue in the present litigation—including Nitromist, Tirosint and Primlev.[133] The complaint, however, was never filed and Reitler was not further retained because progress was made towards settlement.[134]

On June 3, 2013, Laumas sent Mazur a draft term sheet for a settlement between Akrimax and both Mist Pharmaceuticals and Mist Acquisition.[135] Laumas' June 3, 2013 draft term sheet proposed that "Akrimax becomes the licensee and owner of all products with a royalty paid to Mist on a product by product basis" with the products being Tirosint, NitroMist, Suprenza, and Primlev.[136] The proposed terms substantially increased the royalty percentage Akrimax would pay to the Mist entities on each product.[137] It also provided that certain catch-up board fees would be paid and, under the heading "Legal" that there would be "[g]eneral releases amongst all members."[138]

The termination notices sent in April 2013 indicated that the termination date would be June 1, 2013. However, on June 5, 2013, Mist Pharmaceuticals and Mist Acquisition agreed to forbear the respective termination notices until the end of the month.[139] The stated purpose of the forbearance was to give the Mist Entities and

---

[133] *See id.* at ¶¶ 22–51.
[134] Eakins Deposition Aff. Ex. B at 206:12–16 (Laumas).
[135] Eakins Aff. Ex. 40.
[136] *Id.*
[137] *See id.* For example, Tirosint would go from a royalty of 10% of gross sales to 30% of gross sales.
[138] *Id.*
[139] Zahler Aff. Ex. 52.

Akrimax the opportunity to negotiate "a mutually agreeable resolution of the disputes among the Parties."[140] The agreement was signed by Krivulka on behalf of the Mist entities and by Mazur and Laumas on behalf of Akrimax.[141] During the forbearance period, Akrimax agreed to not seek additional documentation from a particular law firm, or to "seek any discovery."[142]

On June 10, 2013, Krivulka circulated an email titled "Issues to discuss."[143] Among other things, the email proposed that Mazur and Laumas choose between (1) paying a 30% royalty on drugs coming back into Akrimax, and keeping a 49% equity stake in Akrimax, or (2) paying a 20% royalty and keeping a 24.5% equity stake in Akrimax.[144] Krivulka's terms also provided that "Steven Laumas and Leonard Mazur will release any and all parties without prejudice," and that Krivulka would have the final decision over the sale of any company assets.[145]

On June 14, 2013 Laumas circulated a new term sheet to Krivulka and Mazur.[146] The royalty rates Laumas selected to be paid by Akrimax remained at 30%—the same as his June 3, 2013 proposal.[147] Laumas stated the "Members of Akrimax consist of Joseph Krivulka ('Krivulka'), Leonard Mazur ('Mazur') and

---

[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] Eakins Aff. Ex. 41.
[144] *Id.*
[145] *Id.*
[146] Eakins Aff. Ex. 42.
[147] *Id.*

Steve Laumas ('Laumas')"—omitting to identify the actual Member, CelestialRX, owned by Laumas.[148] Further, Laumas' June 14 term sheet provided that, as part of the settlement the "Mist [entities] will assign the NDAs and all intellectual property to Akrimax with the right to takeback the assignment upon non-payment of royalties subject to a cure period and arbitration."[149] Finally, Laumas' June 14 term sheet again provided for "[g]eneral releases amongst all members,"[150] described in the term sheet as Krivulka, Mazur, and Laumas.

On June 18, 2013, Krivulka indicated via e-mail to Laumas that "the process needs to move."[151] The next day, Krivulka emailed Laumas "Tick Tock. Tick Tock."[152] The negotiation process continued—by June 25, 2013, the draft Amendment No. 7 circulated by Krivulka indicated that Krivulka would be the "Manager" of Akrimax, and that he would have "full, exclusive and complete discretion" to manage the company subject to the "input" of the Board.[153] Following this draft, Laumas requested a few changes which Krivulka rejected on June 28, 2013.[154] That same day, Krivulka pushed for final execution copies of the various

---

[148] *Id.*
[149] *Id.*
[150] *Id.*
[151] Zahler Aff. Ex. 53.
[152] *Id.*
[153] Zahler Aff. Ex. 55.
[154] Zahler Aff. Ex. 56.

agreements[155] and rejected Laumas' pushback about how a company airplane was being handled in the settlement.[156]

Ultimately several agreements were executed on July 1, 2013. The Plaintiffs assert the agreements were fraudulently induced via Krivulka's representations that he would use his best efforts to ensure that the royalties owed to Mist and other entities were not defaulted on so that the products did not "snap back" or revert out of Akrimax.[157] Similarly, the Plaintiffs assert that Krivulka represented that he would leverage Akrimax to help it acquire new products, and acquire additional licenses.[158] The Plaintiffs argue these were fraudulent representations that induced Laumas to enter the settlement.[159]

## 2. The Agreements

Over a dozen documents were executed on July 1, 2013.[160] Two of those documents are the focus of this Memorandum Opinion—the Release Agreement and Amendment No. 7's fiduciary duty standard. Because a close discussion of those documents' text is necessary to this opinion they are addressed in detail *infra.*

---

[155] Zahler Aff. Ex. 57.

[156] Zahler Aff. Ex. 58.

[157] Zahler Aff. Ex. 62 Response No. 8.

[158] *Id.*

[159] *Id.*; Pls' Answering Br. in Opposition to Krivulka Defs' Motions 28–29.

[160] Compl. ¶ 73 (stating the agreement "comprised of some fourteen separate documents"); Pls' Answering Br. in Opposition to Krivulka Defs' Motions 28 (indicating there were sixteen documents executed).

27

However, a brief overview of the settlement is helpful to understanding the two particular documents at issue here.

I note that certain agreements, including Amendment No. 7, were incorporated into a unanimous written consent of Akrimax's Board, signed by Laumas, Krivulka and Mazur, indicating that the agreements were "advisable and in the best interest" of Akrimax.[161] The Release Agreement was *not* included in the unanimous written consent.[162] In sum, the agreements called for certain drug rights to be put back into Akrimax, or to undo the cancellation of certain rights, in exchange for a revamped ownership structure, with Krivulka's ownership and management power increasing, and Akrimax paying higher royalty rates on the products returned to Akrimax.

One of the July 1, 2013 agreements, the Tirosint "Termination and Royalty Agreement,"[163] provided that Akrimax would terminate the earlier assignment to Mist Pharmaceuticals of its rights to Tirosint.[164] The drug was returned to Akrimax, in exchange for Akrimax paying a 35% royalty on gross sales.[165] However, if Akrimax failed to pay these royalties, upon 45 days' notice Mist Acquisition could retake the rights to Tirosint.[166] Similar agreements were signed for NitroMist and

---

[161] *See* Eakins Aff. Ex. 44.
[162] *See id.*
[163] *See* Eakins Aff. Ex. 46.
[164] *See id.* at Recitals.
[165] *Id.* at § 2.1
[166] *Id.* at §§ 3.1, 3.5.

Primlev.[167] Each permitted Akrimax to continue distributing those drugs at a royalty rate of 30% of net sales.[168]

There was some give and some get from both sides of the July 1, 2013 agreements. For example, a portion of the July 1, 2013 settlement required Laumas' consulting entity, Krittika, to have its consulting fees or board fees paid off the top of Akrimax's payment waterfall.[169] However, in exchange for having certain drug rights put back into Akrimax and increasing his payment priority, Laumas made several concessions including: allowing Krivulka's stake in Akrimax to increase and his to decrease,[170] requiring Akrimax to pay higher royalty rates on drugs put back into Akrimax, Krivulka becoming Akrimax's Manager, and Laumas and Mazur forfeiting their seats on Akrimax's board.[171] Further, as part of the transaction, Laumas executed a Release Agreement releasing certain claims arising prior to the settlement.[172]

*G. Post July 1, 2013 Settlement*

While post July-2013 events are not essential to this partial summary judgment opinion, I note a number of the issues contested in this litigation occurred in this time frame. However, because this decision only addresses the legal question

---

[167] *See* Eakins Aff. Exs. 47, 49.
[168] *See* Eakins Aff. Exs. 47 at §4.1, 49 at ¶ 4.
[169] Eakins Aff. Ex. 45 ¶ 10.
[170] *See id.* at Ex. A.
[171] *See id.* at ¶ 6.
[172] *See* Eakins Aff. Ex 51.

29

of what standard of care applied after July 1, 2013, a detailed discussion of those events is not necessary here. It is sufficient to state that after the settlement, Krivulka continued certain investment activities outside of Akrimax, including in, for example, Cranford Therapeutics. Additionally, Akrimax defaulted on several of the royalty payments it was obligated to make on drugs involved in the settlement in late 2013 and early 2014.[173] Krivulka ultimately loaned Akrimax $1.3 million in March 2014,[174] allegedly due to its low cash balance. The parties heavily dispute why cash balances were low, why defaults occurred, and whether the payment waterfall was properly complied with. It is Plaintiffs' position that Krivulka "engineered" a default, under which Akrimax's rights to drugs reverted out of the company to Krivulka related entities.[175]

### H. Procedural History

Plaintiff CelestialRX filed a verified complaint on November 20, 2015 pleading twelve counts. A TRO hearing was held on November 24, 2015, and this Court subsequently entered an order granting the TRO on December 3, 2015. The parties then engaged in expedited discovery and on February 8, 2016, this Court heard argument on CelestialRX's motion for a preliminary injunction.

---

[173] *See* Compl. ¶¶ 107–08; Eakins Aff. Ex. 66.
[174] Eakins Aff. Ex. 65.
[175] Pls' Answering Br. in Opposition to Krivulka Defs' Motions 46 (arguing "[i]t is clear Krivulka engineered the default").

CelestialRX's request for a preliminary injunction was denied and I indicated to the parties that, moving forward, two legal issues will need to be decided: first, the effect, if any, of the July 1, 2013 Release Agreement, and second, the duties owed under the LLC Agreement.[176]

An Amended Complaint (the "Complaint") was filed on March 8, 2016.[177] The Complaint added several new parties—including a new Plaintiff, Krittika—as well as four new counts. Further, it added the following Defendants: Donald Olsen, JAK Investment Partners, Cranford Pharmaceuticals, Cranford Therapeutics, Holmdel Pharmaceuticals, and Holmdel Therapeutics.

On April 14, 2016, the Court granted a stipulated order governing the proceedings on the two preliminary issues addressed in this Memorandum Opinion.[178] That order permitted discovery to be taken on the two preliminary issues of the effect of the July 1, 2013 Release Agreement, and the duties provided by the LLC Agreement.[179] Each Defendant has moved to dismiss this action on various grounds, including failure to state a claim, and lack of jurisdiction. I am reserving on those motions.

---

[176] *See* Feb. 8, 2016 Oral Arg. Tr. 76:6–77:2.
[177] *See* Zahler Aff. Ex. 1.
[178] April 14, 2016 Scheduling Order for Proceedings Regarding Preliminary Issues.
[179] *Id.* at 3–4.

On July 19, 2016, the Krivulka Defendants moved for partial summary judgment on the following two issues:

> (i) [whether] CelestialRX Investments, LLC's claims relating to or arising from actions through and including July 1, 2013 [should be] barred and dismissed with prejudice, including entry of judgment against Plaintiffs on Count VIII [, the fraudulent inducement count,] of Plaintiffs' First Amended Verified Complaint

> (ii) [whether] Akrimax Pharmaceuticals, LLC's Second and Restated Limited Liability Company Agreement and the Seventh Amendment thereof (collectively, the 'LLC Agreement') eliminated fiduciary duties and Sections 8.01 and 8.02 of the LLC Agreement provide the applicable contractual burden of proof and/or persuasion for conflict transactions.[180]

The Mazur Defendants also moved for partial summary judgment on July 19, 2016 for the grounds set forth in its briefing.[181] In briefing, the Mazur Defendants seek partial summary judgment on the issue of the July 1, 2013 Release Agreement.[182] Oral argument was held October 17, 2016 on all motions, however, the majority of the hearing focused on these two preliminary issues.[183] This Memorandum Opinion addresses Defendants' Motions for Partial Summary Judgment.

## II. STANDARD OF REVIEW

As discussed above, this Memorandum Opinion addresses two preliminary issues raised by the partial summary judgment motions. The parties submit, and I

---

[180] Krivulka Defs' Motion for Partial Summary Judgment.
[181] *See* Mazur Defs' Motion for Partial Summary Judgment.
[182] *See* Mazur Defs' Opening Br. 15–17.
[183] *See* Oct. 17, 2016 Oral Arg. Tr. 7–51, 74–117, 160–163.

32

agree, that a decision on these two issues could clarify the issues in this litigation. Thus I apply the traditional summary judgment analysis to these two issues, reserving decision on the remaining case-dispositive motions.

This Court may enter summary judgment when the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[184] The summary judgment standard puts the initial burden on the moving party to demonstrate the "absence of a material factual dispute."[185] If the moving party satisfies its initial burden then "the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[186] At this point, the nonmoving party may not simply rest on their pleadings, but must point to conflicting evidence in the record that creates a genuine dispute of material fact. In reviewing a motion for summary judgment, the facts and reasonable inferences drawn therefrom "must be viewed in the light most favorable to the non-moving party."[187] However, the Court "will not, draw unreasonable inferences in favor of the non-moving party."[188]

---

[184] Del. Ch. Ct. R. 56(c).
[185] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008), *as revised* (June 24, 2008) (citation omitted).
[186] *Id.* (citation omitted).
[187] *Enrique v. State Farm Mut. Auto. Ins. Co.*, 142 A.3d 506, 511 (Del. 2016) (citation omitted).
[188] *Id.* (citation omitted).

III. ANALYSIS

In analyzing the Defendants' Motions for Partial Summary Judgment, each of which requires me to construe a contract, I am guided by our case law discussing when summary judgment is appropriate in such a context. Generally, "[w]hen the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous."[189] Our Supreme Court has explained that

> [t]his Court has long upheld awards of summary judgment in contract disputes where the language at issue is clear and unambiguous. In such cases, the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language. But, where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence. In those cases, summary judgment is improper.[190]

Specifically, the Supreme Court has indicated that "in a dispute over the proper interpretation of a contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation."[191] I note this same standard applies to the construction of a

---

[189] *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).
[190] *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (citations omitted).
[191] *Id.* at 784.

LLC agreement.[192]  Thus my analysis in interpreting the Release Agreement and the fiduciary standard set by the LLC Agreement will proceed in light of this standard.

### A. *The Release Agreement*

The Defendants seek partial summary judgment that the Plaintiff, CelestialRX, has released all claims existing as of the date of execution of the Release Agreement.  The Defendants argue that the Release Agreement, signed by Laumas individually, "is general and broad in scope" and  released claims pre-dating July 1, 2013, including a count for fraudulent inducement now brought in the present action by Laumas' wholly owned entity CelestialRX.[193]  The Plaintiffs argue that the Release Agreement is clear that only Laumas' individual claims were released, and that CelestialRX and Krittika were not parties to the agreement and thus it is not enforceable against them.  Further, the Plaintiffs allege the agreement was fraudulently induced and therefore not enforceable under New York law.  Because

---

[192] *In re NextMedia Inv'rs, LLC*, 2009 WL 1228665, at *3 (Del. Ch. May 6, 2009) ("In a dispute requiring interpretation of a contract, summary judgment is appropriate only where the contract is unambiguous. Ambiguity exists when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. In other words, to succeed on their motion for summary judgment, the petitioners must demonstrate that their interpretation of the LLC Agreement is the only reasonable one.") (citations and internal quotations omitted). *See Matthew v. Laudamiel*, 2012 WL 2580572, at *5 (Del. Ch. June 29, 2012) (applying traditional contract standard in reviewing motion for summary judgment when interpreting an LLC agreement).

[193] Krivulka Defs' Opening Br. 37.

New York law governs this document, I first review that law and then apply it to the terms of the Release Agreement.[194]

### 1. New York Contract Law

New York law provides that the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent[, and that t]he best evidence of what parties to a written agreement intend is what they say in their writing."[195]  "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[196]  Under New York law, "[a]mbiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent . . . , or when specific language is susceptible of two reasonable interpretations."[197]  Courts applying New York law have recognized that "[a] contract is ambiguous when it could suggest multiple meanings to a reasonable, objective reader familiar with the context of the contract . . . the Court should take into account both the language of the contract and the inferences that can be drawn from that language."[198]  Similarly,

---

[194] Eakins Aff. Ex. 51 § 12.
[195] *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (N.Y. 2008) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002)) (alterations provided by New York Court of Appeals in *Rhodia*).
[196] *Greenfield*, 98 N.Y.2d at 569 (citations omitted).
[197] *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (N.Y. 2014) (internal quotation marks and citations omitted).
[198] *Kobrand Corp. v. Abadia Retuerta S.A.*, 2012 WL 5851139, at *4 (S.D.N.Y. Nov. 19, 2012) (citations omitted).

New York law recognizes that a "contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."[199]  However, "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide."[200]

In *Broyhill Furniture Industries, Inc. v. Hudson Furniture Galleries, LLC*,[201] the New York Appellate Division explained interpretation of a release under New York law as follows:

> [a]s with contracts generally, the courts must look to the language of a release—the words used by the parties—to determine their intent, resorting to extrinsic evidence only when the court concludes as a matter of law that the contract is ambiguous. . . .  The scope of a general release depends on the controversy being settled and the purpose for which the release is actually given . . . .  However, if from the recitals therein or otherwise, it appears that the release *is to be limited* to only particular claims, demands or obligations, the instrument will be operative as to those matters alone.[202]

Regarding introductory portions of a contract, New York law recognizes that "[a]lthough a statement in a 'whereas' clause may be useful in interpreting an

---

[199] *Greenwich Capital Fin. Prod., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010) (internal quotation marks and citation omitted).

[200] *Rhodia, S.A.*, 10 N.Y.3d at 29 (citation omitted).

[201] *Broyhill Furniture Indus., Inc. v. Hudson Furniture Galleries, LLC* 877 N.Y.S.2d 72 (N.Y. App. Div. 2009).

[202] *Id.* at 74 (internal quotation marks and citations omitted) (emphasis added); *See Consol. Edison, Inc. v. Northeast Utilities*, 332 F.Supp. 2d 639, 647 (S.D.N.Y. 2004) (applying New York law and observing "it is well established that the scope of a release turns on the controversy being settled and the purpose for which the release was actually given . . . .[but a] release may not be read to cover matters which the parties did not desire or intend to dispose of") (internal quotation marks and citations omitted).

ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document."[203] Similarly, "although recitals in a contract cannot grant rights extending beyond those particularly described in the agreement, they may be useful in construing the rights and obligations created by the agreement."[204] Thus, under New York law, a recital may be helpful in interpreting the scope of a release, but it cannot create a substantive right beyond the express operative terms of the agreement. With this guidance, I turn to an analysis of the Release Agreement's terms.

### 2. Who Released What?

The Release Agreement was executed on July 1, 2013 as part of Akrimax's reorganization and settlement.[205] The Release Agreement, in its introduction, defines the term parties to mean Steve Laumas, Leonard Mazur, and Joseph Krivulka (the "Parties").[206] I note that CelestialRX is not included as a "Party." The recitals to the Release Agreement indicate that "[t]he Parties, directly or indirectly, own one hundred percent (100%) of the outstanding membership interests of Akrimax Pharmaceuticals, LLC, a Delaware limited liability company (the 'Company')" and

---

[203] *Grand Manor Health Related Facility, Inc. v. Hamilton Equities Inc.*, 885 N.Y.S.2d 255, 256 (N.Y. App. Div. 2009); *See RSL Commc'ns, PLC v. Bildirici*, 2010 WL 846551, at *4 (S.D.N.Y. Mar. 5, 2010) (observing that under New York law, recitals, such as "whereas" clauses, "can be used to clarify the meaning of an ambiguous contract, but cannot be used to modify or create substantive rights not found in the contract's operative clauses").
[204] *In re FKF 3, LLC*, 501 B.R. 491, 506 (S.D.N.Y. 2013).
[205] *See* Eakins Aff. Ex. 51.
[206] *Id.* at Introduction.

that "[t]he Parties desire to fully and finally settle any and all disputes and differences between them, both known and unknown, *among themselves*."[207]

Under the heading "AGREEMENT" in the first subheading titled "1. Release of Claims," the contract provides that:

> IN CONSIDERATION OF THE MUTUAL PROMISES SET FORTH IN THIS AGREEMENT AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY WHEREOF IS HEREBY ACKNOWLEDGED BY THE PARTIES, THE PARTIES, AND THEIR PAST, PRESENT AND FUTURE AGENTS, EMPLOYEES, REPRESENTATIVES, ATTORNEYS, ESTATES, AND ASSIGNS (THE 'RELEASING PARTIES') HEREBY AGREE TO FULLY RELEASE AND DISCHARGE EACH OF THE OTHER PARTIES, AND EACH OF THEIR PAST, PRESENT AND FUTURE AGENTS, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, PARTNERS, PARTNERSHIPS, EMPLOYEES, REPRESENTATIVES, ATTORNEYS, ESTATES, VENDORS, OWNERS, PARENTS, SUBSIDIARIES, AFFILIATES, SUCCESSORS AND ASSIGNS (THE 'RELEASED PARTIES') FROM ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, DEBTS, DUES, SUMS OF MONEY, ACCOUNTS, RECKONINGS, BONDS, BILLS, COVENANTS, CONTRACTS, CONTROVERSIES, AGREEMENTS, PROMISES, DAMAGES, JUDGMENTS, EXECUTIONS, DEMANDS, CLAIMS, OBLIGATIONS, AND/OR LIABILITIES OF ANY KIND WHATSOEVER, KNOWN OR UNKNOWN, DIRECT OR CONSEQUENTIAL, THAT THE RELEASING PARTIES EVER HAD, NOW HAVE, OR MAY IN THE FUTURE HAVE. WITHOUT LIMITING THE FORGOING, THE RELEASES IN THIS PARAGRAPH INCLUDE, BUT ARE NOT IN ANY WAY LIMITED TO, THE RELEASING PARTIES' FULL AND UNCONDITIONAL RELEASE AND DISCHARGE OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS RELATING TO, ARISING FROM,

---

[207] *Id.* at Recitals (emphasis added).

OR IN ANY WAY CONNECTED TO ANY ACTIONS TAKEN BY
THE PARTIES IN CONNECTION WITH THE COMPANY.[208]

The "Release of Claims" subheading of the Agreement, quoted above, defines

Releasing Parties, and Released Parties, but it also uses terms previously defined in

either the recitals (the Company), or in the introduction (the Parties).[209]  The Release

Agreement provides, at a subheading titled "4. Entire Agreement" that:

> [t]his is a 'fully integrated' agreement.  This Agreement contains the
> entire agreement of the Parties with respect to its subject matter, and all
> prior   oral   or   written   agreements,   contracts,   negotiations,
> representations and discussions, if any, pertaining to this matter and the
> Parties hereto are merged into this Agreement.  No party to this
> Agreement has made any oral or written representation other than those
> set forth in this Agreement, and no party has relied upon, or is entering
> into, this Agreement in reliance upon any representation other than
> those set forth in this Agreement.[210]

The Release Agreement was signed over each individual Parties' name.[211]  The issue

before the Court on the Defendants' Motion for Partial Summary Judgment is

whether CelestialRX is barred from bringing claims for pre-July 1, 2013 conduct by

the release.[212]

"Parties" is a defined contractual term, specified to mean Mazur, Laumas, and

Krivulka.  The Releasing Parties—those releasing their claims—are defined as "the

---

[208] *Id.* at § 1 (Capitalization in original).

[209] *See id.*  I note that under New York law, a defined term in an introductory portion of a contract may be considered to "assist in determining the proper construction of a contract." *Potter v. Padilla*, 38 N.Y.S.3d 372, 372 (N.Y. App. Div. 2016) (citations omitted).

[210] Eakins Aff. Ex. 51. § 4.

[211] *Id.* at Signature Blocks.

[212] The same analysis applies to the second Entity Plaintiff controlled by Laumas, Krittika.

parties [Mazur, Lamas, and Krivulka], and their past, present and future agents, employees, representatives, attorneys, estates, and assigns. . . ."[213] CelestialRX is not an agent, employee, representative, attorney, estate or assign of Laumas. The contract defines Released Parties—those being released—more broadly, however. Released Parties includes the "other parties [Mazur, Lamas, and Krivulka], and each of their past, present and future agents, officers, directors, shareholders, members, partners, partnerships, employees, representatives, attorneys, estates, vendors, owners, parents, subsidiaries, *affiliates*, successors and assigns"[214]  I find the language of the Release Agreement clear:  CelestialRX is a Released Party, but not a Releasing Party, as those terms are explicitly described; therefore, the Plaintiff here, CelestialRX, did not release claims existing as of July 1, 2013.[215]

The Defendants point out that the recitals to the contract express that Laumas, along with the other named Parties, is an owner, direct or indirect, of Akrimax, and that the named Parties expressed the desire to settle all claims, "known and unknown, among themselves."[216]  They argue that this precatory language is inconsistent with

---

[213] *Id.* at § 1.

[214] *Id.* (emphasis added).  I note that "affiliates" is an undefined contractual term, but its ordinary meaning would presumably include CelestialRX and Krittika.

[215] While it does not inform my decision here based on the unambiguous language of the Release Agreement, I note that the signature block of the Release Agreement was signed over Laumas' own name with no reference to CelestialRX, whereas other documents executed on July 1, 2013 clearly indicate when Laumas is signing on behalf of an entity.  *See* Eakins Aff. Ex. 52 at Signature Block; Eakins Aff. Ex. 45 at Signature Block.

[216] Eakins Aff. Ex. 51 at Recitals.

a reading of the release as barring claims by Laumas, but not his entity, CelestialRX, the direct Member of Akrimax. It is not clear to me that the intent expressed by the language of the recitals is inconsistent with the contractual release. In any event, to the extent the Defendants are correct, it is unhelpful to them; under New York law, the recitals can be employed to help to interpret an ambiguous contract, or limit the scope of an agreement, but not to vary the terms where no ambiguity exists or expand the scope of an operative section.[217] The individual Parties to the release entered a contract that explicitly defined Releasing Parties more narrowly than Released Parties; CelestialRX is included in the latter, not the former. The Defendants argue vehemently that the intention of the parties at the time they entered the Release Agreement, as reflected in the record, is contrary to this express language. They point to much of the record evidence recited in the background section of this Memorandum Opinion, highlighting the dispute over the Middlemen Entities that had arisen among the Akrimax principals; and argue that, in light of that dispute, and in light of the drafting history, it would be nonsensical, and contrary to all Parties' subjective intent, to have excluded CelestialRX from the release. Perhaps so: the argument may raise issues of reformation, but that issue is neither before me on the current motion nor generally susceptible to summary judgment. Accordingly, the

---

[217] *See Grand Manor Health Related Facility, Inc. v. Hamilton Equities Inc.*, 885 N.Y.S.2d 255, 256 (N.Y. App. Div. 2009); *RSL Commc'ns, PLC v. Bildirici*, 2010 WL 846551, at *4 (S.D.N.Y. Mar. 5, 2010).

42

Defendants' Motion for Partial Summary Judgment that CelestialRX has released claims existing as of July, 1, 2013, is denied.

### B. Duties Under the LLC Agreement

The second prong of Defendants' Motion for Partial Summary Judgment seeks a judicial determination that Akrimax's LLC Agreement together with Amendment No. 7 thereto "eliminated fiduciary duties."[218] Additionally, Defendants seek partial summary judgment that "Sections 8.01 and 8.02 of the LLC Agreement provide the applicable contractual burden of proof and/or persuasion for conflict transactions."[219] Thus the Defendants seek a determination that even if Amendment No. 7 did not eliminate fiduciary duties, and "some residual fiduciary duties survived, Sections 8.01 and 8.02 of the LLC Agreement provide express contractual standards for corporate opportunities and conflict transactions that displaced whatever remaining fiduciary duty might otherwise apply."[220] The Defendants' assert that their position presents "two paths" to the same result.[221] These provisions are analyzed in turn below. I note that I have taken the unusual step of addressing this contractual standard before evidence of the behavior of the parties is fully in the record, because I believe that addressing the Defendants'

---

[218] Krivulka Defs' Motion for Partial Summary Judgment; Krivulka Defs' Opening Br. 55.
[219] Krivulka Defs' Motion for Partial Summary Judgment.
[220] Krivulka Defs' Opening Br. 55.
[221] *See* Oct. 17, 2016 Oral Arg. Tr. 36:18–19 ("We have two paths to get there. These are paths that both lead to the same result.").

motions in this fashion will clear some of the underbrush of this overgrown litigation, and allow rational litigation (or settlement) decisions going forward. The discussion below defines only duties applicable to the Defendants after July 1, 2013.

### 1. Amendment No. 7

Resolving the issues stated above requires interpretation of the fiduciary duties provided by Akrimax's LLC Agreement. Specifically, the parties dispute the meaning of the language in Section 4.01(h)[222] which was added by Amendment No. 7 on July 1, 2013, contemporaneously with the Release Agreement discussed above. Under the Delaware Limited Liability Company Act ("LLC Act") our Courts have implied fiduciary duties to managers of an LLC, unless contractually waived.[223] This approach has been embodied in the LLC Act itself.[224] In other words, the intention of the parties to the agreement that fiduciary duties apply to managers is implied where that agreement does not provide otherwise. The LLC Act is explicitly contractarian, however, and permits the elimination of some, or all, fiduciary duties for members, managers or others through a provision in an LLC agreement,

---

[222] I note that Delaware law applies to the interpretation of Amendment No. 7 and the LLC Agreement. *See* Eakins Aff. Ex. 45 ¶ 16; Eakins Aff. Ex. 2 § 11.07.

[223] *See Kelly v. Blum*, 2010 WL 629850, at *10 n.69 (Del. Ch. Feb. 24, 2010) (collecting cases and explaining interpretation); *see also*, *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) ("the Delaware Limited Liability Company Act . . . contemplates that equitable fiduciary duties will apply by default to a manager or managing member of a Delaware LLC").

[224] *See* H.B. 126, 147th Gen. Assemb. (Del. 2013) (amending 6 *Del. C.* § 18-1104 to provide the following: "In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern.").

"provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing."[225] Similarly, in the context of construing LLC agreements, this Court has recognized that "[a]lthough fiduciary duties may be disclaimed, agreements' drafters must do so clearly, and should not be incentivized to obfuscate or surprise investors by ambiguously stripping away the protections investors would ordinarily receive."[226] Thus, this Court has consistently found that removal of a manager's default fiduciary duties from an LLC agreement must be clear and unambiguous.[227]

The parties dispute the extent to which Amendment No. 7's language removes, modifies, or alters fiduciary duties owed by Members, Managers, and Officers of Akrimax. The battleground in this dispute centers around whether the following language completely removes fiduciary duties—or removes fiduciary duties except for subparts (i) and (ii):

> [n]otwithstanding anything to the contrary in this Agreement, neither the Manager nor any of the members of the Board of Directors nor any Member shall have any fiduciary duties to the Company or the Members or shall be personally liable to the Company or its Members for a breach of any duty that does not involve (i) an act or omission not in good faith or which involves intentional misconduct or a knowing violation of law; or (ii) a transaction from which such Manager, a

---

[225] 6 *Del. C.* § 18-1101(c).

[226] *Ross Holding & Mgmt. Co. v. Advance Realty Grp., LLC*, 2014 WL 4374261, at *15 (Del. Ch. Sept. 4, 2014).

[227] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012) ("Drafters of an LLC agreement 'must make their intent to eliminate fiduciary duties plain and unambiguous.'") (quoting *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009)).

member of the Board of Directors, or Member derived an improper personal benefit.[228]

Each side asserts various textual arguments regarding the above language. Further, in the alternative, the Krivulka Defendants argue that even if the above did not eliminate all fiduciary duties, the LLC Agreement provides specific contractual standards via Sections 8.01 and 8.02 to govern conflict transactions and corporate opportunities, respectively.[229]

Despite the linguistic, grammar and punctuation arguments each side advances,[230] I read this provision by what I view as its plain meaning in accordance with Delaware law.[231] I find that the plain language of 4.01(h) generally eliminates common-law fiduciary duties except that it retains liability for intentional or illegal misconduct and other bad faith actions, as well as for improper self-dealing.[232]

---

[228] Eakins Aff. Ex. 45 ¶ 6(h).

[229] *See* Krivulka Defs' Opening Br. 58.

[230] Such arguments brought to my attention the existence of the "Purdue Owl," which is apparently a helpful tool for grammarians. *See* Oct. 17, 2016 Oral Arg. Tr. 111:13–23. I note that I am cognizant of our case law that provides punctuation and grammar provide useful signposts. *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (resolving "a grammatical dispute" in the interpretation of a contract).

[231] Eakins Aff. Ex. 45 ¶ 16 (indicating Delaware law governs the interpretation of the amendment); *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 683 (Del. 2013) (observing that under Delaware law, courts "interpret clear and unambiguous contract terms according to their plain meaning").

[232] The Plaintiffs have pled and asserted in briefing that all constituent documents of the July 1, 2013 agreements, including Amendment No. 7, were fraudulently induced and thus not enforceable. *See* Pls' Answering Br. in Opposition to Krivulka Defs' Motions 70–71 (arguing "Krivulka and/or Mazur fraudulently induced Laumas to enter into the Release Agreement (indeed, all of the July 1, 2013 Agreements, including the 7th Amendment to the Operating Agreement)"); Compl. at Count VIII. The issue of fraudulent inducement of Amendment No. 7 is reserved.

Those duties are contractual in nature, but to the extent they employ undefined terms such as "bad faith," the common law fiduciary duties are instructive in supplying the definition.

Subparts (i) and (ii) of Section 4.01(h) provide that Managers, Members and the Board are liable where they have acted in bad faith, or where they have engaged in certain acts of self-dealing; that is, have engaged in transactions creating an "improper personal benefit."[233] Interpreting, as I must, the contract as a whole, it becomes clear that whether a conflicted transaction involves an "improper personal benefit" must be assessed in light of Sections 8.01 and 8.02 of the LLC Agreement. As discussed below, I find that together these provisions provide specific contractual standards which govern conflict transactions and corporate opportunities.

### 2. Sections 8.01 and 8.02

Unfortunately, examination of liability here must involve an application of the facts to the contractual language of these sections—unfortunately, because, as is all-too-common in LLC agreements litigated in this Court (a self-selecting sample, I acknowledge), the provisions here are poorly drafted. The text of the sections is as follows:

> [Section 8.01 provides:] (a) [u]nless entered into in bad faith, no contract or transaction between the Company and one or more of its

---

[233] *See* Eakins Aff. Ex. 45 ¶ 6(h) ("(i) an act or omission not in good faith or which involves intentional misconduct or a knowing violation of law; or (ii) a transaction from which such Manager, a member of the Board of Directors, or Member derived an improper personal benefit").

47

Members or any Indemnified Party, or between the Company and any other Person in which one or more of its Members or any Indemnified Party has a financial interest or is a director, manager or officer, shall be voidable solely for this reason if such contract or transaction is fair and reasonable to the Company as determined in good faith by the Manager; and no Member or Indemnified Party interested in such contract or transaction, because of such interest, shall be liable to the Company or to any other Person or organization for any loss or expense incurred by reason of such contract or transaction or shall be accountable for any gains or profit realized from such contract or transaction.[234]

(b) [u]nless otherwise expressly provided herein, (i) whenever a conflict of interest exists or arises between the Company, its Members and/or the Indemnified Parties, or (ii) whenever this Agreement provides that any such Person shall act in a manner that is, or subject to Section 8.01(a) above, provide terms that are, fair and reasonable to the Company or any Member, such Person shall resolve such conflict of interest, taking such action or providing such terms, considering in each case the relative interest of each party (including its own interest) to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or acceptable industry practices, and any applicable generally acceptable accounting practices or principles. In the absence of bad faith by the Member or Indemnified Party, as the case may be, the resolution, action or term so made, taken or provided by such Person shall not constitute a breach of this Agreement or any other agreement contemplated herein or of any duty or obligation of such Person at law or in equity or otherwise.[235]

[Section 8.02 provides:] [n]othing in this Agreement shall be construed to prohibit any Director or any Member from engaging in or possessing an interest in another business venture of any nature, even if competitive with the Company; and neither the Company nor any other Member shall have any rights by virtue of this Agreement in or to any such venture or the income or profits derived therefrom. No Person solely by virtue of his or its status as a Director or Member of the Company, shall be prohibited from engaging in or possessing an

_____

[234] Zahler Aff. Ex. 3 § 8.01(a).
[235] *Id.* at § 8.01(b).

interest in another business venture of any nature, even if competitive with the Company. Neither any Director nor any Member shall be obligated, by the provisions hereof or by their status as a Director or Member, to present any particular investment or business opportunity to the Company even if such opportunity is of a nature which could be taken by the Company. This Section 8.02 is not intended to waive or amend any restriction on competition, confidentiality[,] disclosure, solicitation, or other activities, which may be governed by applicable law, or included in an employment agreement, confidentiality or nondisclosure agreement, or any other contract between the Company and any Member or Manager, which restrictions shall in all such matters control.[236]

### a. Section 8.02

This section eschews the corporate opportunity doctrine, and permits conflicted interests to be held by Directors and Members, unless provided otherwise by separate contract. The requirements under which conflicted transactions are permitted are set out in the safe-harbor provisions of Section 8.01, discussed below.

### b. Section 8.01

The safe harbor of Section 8.01(a) exists where a conflicted transaction involving the Company and its Members or "any Indemnified Party"—a defined term that includes officers and affiliates[237]—is (1) entered in the absence of bad faith, and (2) the "Manager" (before July 1, 2013, collectively Mazur, Krivulka and Laumas; thereafter Krivulka) determines—in good faith—that the transaction is

---

[236] *Id.* at § 8.02.

[237] *See id.* at Article I (defining "Indemnified Parties" stating it "shall mean the Manager, the Directors, any Affiliate of the Directors and each Officer of the Company and their respective successors and assigns, each in their capacity as such").

"fair and reasonable to the Company."[238]  In such case, the conflicted party bears no liability to the "Company or to any other Person" arising from the transaction.

Section 8.01(b), as I read it, provides an alternative safe harbor.  With respect to conflicted transactions as defined in Section 8.01(a), the terms of which are limited to those "fair and reasonable to the Company or any Member," the conflicted party who seeks a safe harbor under subsection (b) is charged with "resolv[ing] such conflict" by "considering . . . the relative interest of each party (including its own interest) to such . . . transaction or situation and the benefits and burdens relating to such interests, any customary or acceptable industry practices, and [GAAP]."[239] Where the conflicted party has acted in good faith, and makes the required resolution of the conflict by a good-faith balancing of the factors above, he is insulated from liability, since he is deemed not in "breach of this Agreement . . . or of any duty or obligation . . . at law or in equity . . . ."[240]  Conflicted transactions not achieving one of these safe harbors are, by contrast, transactions from which the party may be shown to have derived an improper personal benefit under Section 4.01(h)(ii), in breach of his duty under that section.

The parties do not contend that the safe harbor of Section 8.01(a) applies here. Therefore, the Defendants will be found not to have breached a duty under Section

---

[238] *Id.* at § 8.01(a).
[239] *Id.* at § 8.01(b).
[240] *Id.*

4.01(h)(ii), and are insulated from liability under Section 8.01(b), where the conflicted transaction was (1) entered in good faith,[241] and (2) where the particular Defendant subjectively determined that the transaction was fair and reasonable to the Company and Members after the required good-faith balancing of interests. That is the standard against which the challenged transactions (entered on or after July 1, 2013) shall be evaluated. This specific contractual standard applies to all Indemnified Parties, as defined in the LLC Agreement.[242] I note that good faith—a subjective standard, applies separately to both the transaction and to the conflicted party's analysis of whether it is "fair and reasonable." I do, however, note that the subjective good faith standard here must be read consistently with the purpose of Sections 8.01 and 8.02, which is to permit conflicted transactions in certain circumstances.[243]

---

[241] Our Supreme Court, when faced with an undefined good faith or bad faith provision in an alternative entity situation has employed the following standard: "an action 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'" *DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago*, 75 A.3d 101, 110 (Del. 2013) (quoting *Brinckerhoff v. Enbridge Energy Co.*, 67 A.3d 369, 373 (Del. 2013)).

[242] *See* Zahler Aff. Ex. 3 at Article I, § 8.01(b).

[243] *See Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010) (explaining that when parties to an alternative entity "cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default").

## IV. CONCLUSION

For the forgoing reasons, the Defendants' Motions for Partial Summary Judgment are GRANTED in part and DENIED in part. Specifically, the prong of the motion regarding the release is DENIED. The prong of the motion interpreting fiduciary duties owed by the governing documents is resolved consistent with the discussion above. The parties should confer regarding the most efficient way to move this matter forward in light of this Memorandum Opinion.